DISENOS ARTISTICOS E INDUSTRIALES, S.A., A Spanish corporation, Plaintiff,

v.

Edward WORK, an individual; Dolores Work, an individual; Karen–Leslie Co., a partnership; and Karen–Leslie Co., Inc., a New York corporation, Defendants.

KAREN–LESLIE CO., INC., a New York corporation, Counterplaintiff,

v.

DISENOS ARTISTICOS E INDUSTRIALES, S.A., a Spanish corporation; Weil Ceramics & Glass, Inc., A New York corporation; and Lladro, S.A., a Spanish corporation, Counterdefendants.

WEIL CERAMICS & GLASS, INC., a New York corporation, Plaintiff,

v.

Edward WORK, an individual; Dolores Work, an individual; Karen–Leslie Co., a partnership; and Karen–Leslie Co., Inc., a New York corporation, Defendants.

Nos. CV–83–4149, CV–84–1964.

United States District Court, E.D. New York.

Dec. 15, 1987.

Anthony F. LoCicero, Amster, Rothstein & Engelberg, New York City, Bernard R. Gans, Eugene H. Valet, Poms, Smith, Lande & Rose, Los Angeles, Cal., for plaintiffs and counterdefendants.

David Brown, Garden City, N.Y., Eric H. Weisblatt, Burns, Doane, Swecker & Mathis, Alexandria, Va., for defendants and counterplaintiffs.

GLASSER, District Judge.

The motions currently before the Court arise out of a dispute concerning the sale and distribution of Lladro porcelain figurines in the United States ("U.S."). In September 1983, plaintiff Disenos Artisticos E Industriales, S.A. ("DAISA") commenced a civil action, 83 CV 4149, against defendants, Edward Work, Dolores Work, and Karen–Leslie Co., alleging copyright infringement. Karen–Leslie Co., Inc. was added as a new party defendant in December 1983. In December 1983, Karen–Leslie Co., Inc. counterclaimed against DAISA, Weil Ceramics & Glass, Inc. ("Weil"), and Lladro, S.A. asserting antitrust violations. In May 1984, Weil commenced a civil action, 84 CV 1964, against Edward Work, Dolores Work, Karen–Leslie Co., and Karen–Leslie Co., Inc., alleging trademark infringement. In May 1984, Karen–Leslie Co., Inc. again counterclaimed against DAISA, Weil, and Lladro, S.A. repeating the antitrust assertions. The two civil actions were consolidated in July 1984.

## I. THE PARTIES

Plaintiff and counterdefendant DAISA, a Spanish corporation, designs Lladro porcelain and alleges that it owns the U.S. and foreign copyrights on these products. Counterdefendant Lladro, S.A., another

Spanish corporation, manufactures Lladro porcelain in Spain. Plaintiff and counterdefendant Weil, a New York corporation, alleges that it is the designated exclusive importer and distributor of Lladro figurines in the U.S. and that it is the registered owner of the U.S. trademark. Weil is wholly owned by Lladro Exportadora, S.A., a Spanish corporation. Lladro Exportadora, S.A., DAISA, and Lladro, S.A. are each wholly owned by Sodigei, S.A.,[1] a Spanish corporation. Sodigei is owned by the Lladro brothers. *See* Memorandum and Order dated February 18, 1986, 110 F.R.D. 500 (Scheindlin, Mag.) at 501.

Defendant and counterplaintiff Karen-Leslie Co., a partnership that was located in New York, apparently ceased doing business on December 31, 1980. *See* Counterdefendants' Memorandum of Points and Authorities in Support of the Motion for Summary Judgment Regarding the Antitrust Issues; and for Dismissal of the Counterclaims, Exhibit B. Defendant and counterplaintiff Karen-Leslie Co., Inc., a New York corporation incorporated on December 10, 1980, *see id.*, acquires giftware and resells it to retailers. Defendants Edward Work and Dolores Work are officers of Karen-Leslie Co., Inc.

## II. THE MOTIONS

Prior motions, if relevant, will be discussed below under the appropriate subject headings. Currently before the Court are the following motions: defendants have moved for summary judgment on plaintiff DAISA's copyright causes of action and plaintiff Weil's trademark causes of action; plaintiff Weil has cross-moved for summary judgment on its trademark causes of action; and counterdefendants have moved for summary judgment on the antitrust counterclaims.

## III. SUMMARY JUDGMENT

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, counterdefendants' motion may be granted only if the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reaching this determination, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985)), *cert. denied,* — U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). While "[t]he movant bears the initial burden of demonstrating 'the absence of a genuine issue as to any material fact,'" this burden may be met by "simply ... pointing out that the plaintiff has failed to present any evidence to establish a necessary element of the cause of action." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987) (citations omitted). The nonmoving party then bears the burden of "set[ting] forth specific facts showing that there is a *genuine* issue for trial." Fed.R. Civ.P. 56(e); *Apex Oil,* 822 F.2d at 252 (citations omitted). As enunciated by the Supreme Court in a recent antitrust decision, the nonmoving party's burden requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986) (citations omitted).

With these general principles in mind, the Court will review each of the claims and the evidence submitted by both sides.

## IV. COPYRIGHT ISSUES

Defendants have moved for summary judgment on plaintiff DAISA's copyright cause of action. Defendants assert, first, that their sale in the U.S. of lawfully made copies of Lladro goods is not an infringe-

---

**1.** Apparently, there is another entity on this corporate ladder. For purposes of these motions, however, the simplified structure set forth above will suffice.

ment of plaintiff DAISA's copyrights.[2] Second, defendants assert that plaintiff DAISA has no valid copyright in the Lladro figurines sold by defendants.

## A. BACKGROUND

The following facts appear to be largely undisputed, at least for purposes of this motion. DAISA first published the thirty-one sculptural works at issue in January 1978 and January 1979 and for three or four years thereafter these items were manufactured and distributed without any notice of copyright. These works were registered with the U.S. Copyright Office in April 1982. Just before registration, the omission of the required copyright notice was discovered by DAISA. According to plaintiffs, "DAISA and the factory quickly instituted new manufacturing procedures to place the proper copyright notice on the porcelain that was thereafter manufactured and distributed." Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on the Copyright and Trademark Causes of Action at 10. As discussed below, no copyright notice was added to those items already manufactured but not yet sold to the public.

## B. DISCUSSION

For the reasons set forth below, this Court finds that plaintiff DAISA does not have a valid copyright in the works at issue. Because the works at issue are thus not protected by the U.S. Copyright Act, plaintiffs' claim of infringement is not cognizable as a matter of law, and defendants' motion for summary judgment as to plaintiff's copyright claim is granted.

### 1. Validity of the Copyright

In support of their argument that DAISA does not have a valid copyright in any

of the Lladro figurines sold by defendants, defendants argue that for three to four years the Lladro group distributed copies of these works without the copyright notice required by statute and that the Lladro group made no effort to add proper notice to those copies distributed to the public after the omission was discovered. Defendants' Memorandum in Support of Motion for Summary Judgment at 2.

■ Under the 1976 Copyright Act, a notice of copyright must be placed on all publicly distributed works protected by the Act. *See* 17 U.S.C. § 401(a). A work published without proper notice is, in general, injected into the public domain. *See id.; Shapiro & Son Bedspread Corp. v. Royal Mills Associates*, 764 F.2d 69, 72 (2d Cir. 1985); 2 M. Nimmer, *Nimmer on Copyright* § 7.14[A][2] (1987). However, omission of the required notice can be cured under section 405(a) of the Act if one of the following conditions is met:

(1) the notice has been omitted from no more than a relatively small number of copies ... distributed to the public; or

(2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered; or

(3) the notice has been omitted in violation of an express requirement in writing that, as a condition of the copyright owner's authorization of the public distribution of copies ..., they bear the prescribed notice.

17 U.S.C. § 405(a).

■ In this case, it is undisputed that only the second provision of § 405(a) is applicable.[3] The parties apparently agree,

---

**2.** In its complaint, plaintiff DAISA listed over 200 copyright registrations that it allegedly owned. Subsequent to discovery, plaintiff reduced this list to include only the thirty-one items it believed defendants were actually selling. *See* Order dated September 12, 1984 (granting plaintiff's motion to dismiss without prejudice its complaint as to alleged copyright infringement of certain registered works).

**3.** Section 405(a)(1) is clearly inapplicable. DAISA's chief executive officer estimated that at the time the omission was discovered, about 150,-000 pieces were in the warehouse, *see* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Exhibit 7 (Oltra Deposition) at 171, and these were apparently distributed without notice. Defendants also suggest that "Weil and its retailers in the United States undoubtedly

at least for purposes of this motion, that the thirty-one works at issue were registered within five years of the publication without notice. The sole issue, therefore, is whether plaintiffs made a reasonable effort to add notice to all copies distributed to the public in the United States after the omission was discovered.

Plaintiffs cite *Shapiro & Son Bedspread Corp. v. Royal Mills Associates,* 764 F.2d 69 (2d Cir.1985), as controlling authority on this issue, but that case is clearly distinguishable. In *Shapiro,* the district court had granted the defendants' motion for summary judgment on the plaintiff's claim of copyright infringement, holding that plaintiff's copyright was invalid because plaintiff had not demonstrated that it had made any effort to add proper notice to its bedspreads after discovering that the bedspreads bore deficient notice. *Id.* at 72. The district court, however, had ignored the fact that the plaintiff had, upon discovering its defective notice, taken "prompt steps to correct the notice on the bedspreads in its inventory and to ensure that it shipped no further units without proper notice affixed." *Id.* at 74. The district court focused, instead, on the plaintiff's decision not to add proper notice to those bedspreads already shipped to retailers although not yet sold to customers. *See id.; see Shapiro & Son Bedspread Corp. v. Royal Mills Associates,* 568 F.Supp. 972, 977 (S.D.N.Y.1983) (denying motion for preliminary injunction).

In reversing the district court, the Second Circuit noted preliminarily "that if *no* effort is made to add proper notice to copies distributed to the public after the defective notice is discovered, no cure is accomplished." 764 F.2d at 73 (emphasis in original). The court then held that if *"some* effort is made, the question whether it was 'reasonable' is one of fact." *Id.* (emphasis added) (citation omitted). The Second Circuit further explained that the inquiry as to reasonableness under section 405(a)(2) re-

lates to *all* copies distributed to the public after the defect or omission is discovered. *Id.* at 73–74. Specifically, in the case before it, the court found that the copies at issue included those still in the plaintiff's inventory, those already in the distribution chain but not yet sold to consumers, and those manufactured subsequent to discovery of the defect or omission. *Id.* at 74.

It was not disputed in *Shapiro* that the plaintiff had added proper notice to those bedspreads manufactured subsequent to discovery of the defective notice. *Id.* at 71. The Second Circuit's criticism of the district court's conclusion involved the lower court's disregard of the plaintiff's successful re-labeling of those bedspreads still in inventory and the lower court's conclusion that the plaintiff's decision not to re-label goods already shipped to retailers was unreasonable as a matter of law. *Id.* at 74. The Second Circuit concluded that these factors raised genuine issues of fact as to the reasonableness of the plaintiff's efforts. *Id.* at 74–75.[4]

■ The Second Circuit's decision in *Shapiro* does not bar this court from granting defendants' motion for summary judgment. Rather, plaintiff DAISA's response to discovery of its omission falls within the preliminary rule set forth in *Shapiro* that when there is *no* effort made to add proper notice to *all* copies, "no cure is accomplished." *Id.* at 73. While plaintiff DAISA alleges that it promptly instituted procedures to insure that all newly manufactured figurines had proper notice, it also concedes that none of the figurines in its inventory or in the hands of its distributors were properly labeled before distribution to the public. There is no support in *Shapiro* for the proposition that merely taking prospective action to correct an omission is adequate under section 405(a)(2). Indeed, the plaintiff in *Shapiro* made that argument before the district

---

also had thousands of unmarked figurines on hand." Defendants' Memorandum at 6 n. 1. Neither side has indicated how many copies were distributed before the omission was discovered, but there has been no assertion that the

number was relatively small. There is also no assertion by the parties that § 405(a)(3) is applicable.

**4.** *See* note 8 *infra.*

court, *see* 568 F.Supp. at 977, and that court did not find it persuasive, nor, apparently, did the Second Circuit.

Plaintiffs have cited only *Shapiro* in support of their argument against defendants' motion. An extensive, although perhaps not exhaustive, search by this Court has revealed no support for plaintiffs' position that there is at least a factual dispute with respect to its efforts to cure its omission of notice. No court addressing the issue has concluded, explicitly or implicitly, that a prospective cure, by itself, satisfies section 405(a)(2) with respect to copies not yet distributed to the public. *See Donald Frederick Evans & Associates v. Continental Homes, Inc.*, 785 F.2d 897, 911–12 (11th Cir.1986) (plaintiff's showing that notice was added to second printing of its sales brochures did not effectuate a cure under 17 U.S.C. § 405(a)(2) because, *inter alia,*

plaintiff made no showing that it had made a reasonable effort to add notice to those copies in its first printing that had not yet been distributed at time omission was discovered); *M. Kramer Manufacturing Co. v. Andrews*, 783 F.2d 421, 444 (4th Cir. 1986) ("Based on the statutory language, a copyright owner does have an obligation to add copyright notice to games that are *stored or that have been distributed to retail dealers,* but not yet to the public.") (emphasis added) [5]; *Animal Fair, Inc. v. AMFESCO Industries, Inc.*, 620 F.Supp. 175 (D.Minn.1985) (slipper manufacturer's efforts to cure its inadvertent omission of copyright notice on sewn-in seam labels were found to be reasonable because manufacturer took "[i]mmediate action ... to remedy the problem" by instructing its production facility to add notice to those copies

5. While the decision in *Kramer* might, at first glance, seem to provide support for plaintiff's position, it is clearly distinguishable. In *Kramer,* the manufacturer of a computer video game discovered that its notice did not comply with the statutory requirements and was therefore defective. The manufacturer immediately added proper notice to every game manufactured and sold thereafter. 783 F.2d at 431 & 444. The district court, however, found that the manufacturer had forfeited its copyright because it had made no effort to add proper notice to games in its regional warehouses or in the possession of its distributors and because it had not sent out replacement programs to consumers who had already purchased the games. *Id.* In reversing the district court's finding, the Fourth Circuit noted first that the manufacturer had no obligation under the statute to send out replacement programs because those games had already been distributed to the public. *Id.* at 444. Next, the court noted that while a copyright owner must add notice to games that are in storage or that have been distributed to retail dealers but not yet to the public, the manufacturer's effort to do so need only be a reasonable one. *Id.* (citations omitted). The court in *Kramer* found that the manufacturer's effort was reasonable because, *inter alia,* the manufacturer had responded to its error promptly and because only three or four games that had been sold prior to the discovery of the defective notice were actually delivered after the discovery. *Id.* While it is not clear from the opinion, a fair reading indicates that these three or four games had already been sold as part of a lot sale and were in storage only because the manufacturer was awaiting payment. *Id.* Furthermore, the Fourth Circuit determined that the district court's finding that the manufacturer had failed to add proper notice to games in the hands of its

distributors was erroneous because the manufacturer had no retail distributors; rather, it sold directly to the public. *Id.*

Therefore, while it is possible to read the decision in *Kramer* as excusing delivery without proper notice after a defect or omission in notice is discovered, a more accurate reading is that the Fourth Circuit excused the delivery without proper notice of only a very small number of games and it did so because the manufacturer's efforts to comply with proper notice requirements, viewed as a whole, were more than reasonable. Based upon the facts of the case and the Fourth Circuit's discussion, the decision provides no support for concluding that a prospective cure, by itself, satisfies the requirements of section 405(a)(2).

In contrast to the facts of *Kramer,* plaintiffs in this case concede that a large number of unmarked figurines were in inventory at the time that omission of the required notice was discovered and that these pieces were subsequently distributed without notice, although the record admittedly does not indicate how many of these were distributed in the U.S. Furthermore, these pieces had *no* notice, whereas in *Kramer,* the games seem to have had at least defective notice. While the court in *Kramer* did not mention this latter point as a basis for reversal of the district court, this point was mentioned by the Second Circuit in *Shapiro* when it distinguished a case the district court had found persuasive. *Shapiro,* 764 F.2d at 75 (distinguishing *Beacon Looms, Inc. v. S. Lichtenberg & Co.*, 552 F.Supp. 1305 (S.D.N.Y.1982), in which no notice had been affixed, and noting that at least "some form of notice, albeit defective, had been included, so that a purchaser would be aware that some proprietary claim was being asserted").

apparently not yet shipped and to add notice to all copies subsequently manufactured; while manufacturer did not send replacement labels to its retail outlets to cover copies already shipped at time omission was discovered, it was undisputed that those copies had notice on hangtag attached to each pair of slippers) *aff'd without opinion,* 794 F.2d 678 (8th Cir.1986); [6] *Videotronics, Inc. v. Bend Electronics,* 586 F.Supp. 478, 483 (D.Nev.1984) (plaintiff's decision to continue manufacturing its double board program without copyright notice until its scheduled conversion to a single board program, which did include proper notice, precluded a conclusion that plaintiff's omission was cured under § 405(a)(2) and established instead that plaintiff made "no effort"); *Innovative Concepts in Entertainment, Inc. v. Entertainment Enterprises, Ltd.,* 576 F.Supp. 457, 460–61 (E.D.N.Y.1983) (plaintiff made reasonable efforts to cure omission of notice by applying stickers to games still in its possession and by mailing stickers to its distributors "in an effort to affix notice to games already distributed"); *see also House of Hatten, Inc. v. Baby Togs, Inc.,* 668 F.Supp. 251 (S.D.N.Y.1987); 2 M. Nimmer, *supra,* § 7.13[B][2]. Indeed, the language of the statute would seem to preclude such a result. *See* 17 U.S.C. § 405(a)(2) (copyright is not invalidated if "a reasonable effort is made to add notice to *all* copies distributed to the public in the United States after the omission has been discovered") (emphasis added); *see also Shapiro,* 764 F.2d at 73–74 (statute covers copies in inventory and in intermediate stage of distribution as well as those made in the future).

■ Plaintiff attempts to excuse the omission of notice from those copies in inventory and those already shipped to distributors by asserting that any method of affixing notice to these copies would have required an unreasonable effort. Plaintiff seems to be arguing that even though it decided not to add notice to these pieces, its consideration of the problem and several possible solutions to it itself constituted a reasonable effort under the statute.

This argument is not persuasive. Plaintiff has not established that all, or even most, attempts to affix notice would have been unreasonable or unavailing. The regulations promulgated by the U.S. Copyright Office under section 401(c) of the Copyright Act provide a number of examples of acceptable methods of affixation, *see* 37 C.F.R. § 201.20(i), and specifically state that these methods are not exclusive, *see id.* at (a)(i).[7] For instance, notice may be affixed directly to the work or may be affixed by use of a label or tag attached durably.

Plaintiff has alleged that two methods were specifically considered and rejected—re-baking the porcelain or attaching adhesive labels. While the record indicates that the effort and expense involved in re-baking might have been unreasonable, there is no adequate showing that an attempt to affix labels or tags would have been unreasonable.[8] Nor is there any

---

**6.** While the court in *Animal Fair* thus excused the omission of notice on sewn-in labels of those slippers already shipped to retailers, that decision does not seem to support a finding that a prospective cure is sufficient. First, while the opinion is not clear on this point, it appears that the manufacturer had re-labeled those copies still in its possession. 620 F.Supp. at 179. Second, while the court declined to reach the question of whether the notice on the hangtags was affixed within the meaning of 17 U.S.C. § 401, *id.,* and thus did not consider this factor in its decision on whether the manufacturer had sufficiently complied with the notice requirements of the Copyright Act, it nonetheless seems clear that this factor had a bearing on the court's determination that the manufacturer's omission did not invalidate the copyright. *Cf. id.* at n. 15

("The court would simply note that there is no doubt in this case that the copyright notice on the hangtag was prominent to anyone purchasing or inspecting the product....").

**7.** *See* note 8 *infra.*

**8.** Plaintiff asserts that it rejected the use of adhesive labels because of its knowledge that such labels are not permanent; therefore, it believed that this method would not have been acceptable. *See* Plaintiffs' Opposition at 13. However, defendants correctly argue that the applicable regulations promulgated under section 401(c) do not require that notice be physically incorporated in the work or *permanently* attached. Rather, two of the alternative examples of acceptable methods of affixation include

Note 8—Continued

use of a label that is "cemented, sewn, or otherwise attached *durably,* so as to withstand normal use," 37 C.F.R. § 201.20(i)(2) (emphasis added), or the use of a tag that is "of durable material, so as to withstand normal use, and that is attached to the copy with sufficient *durability* that it will remain with the copy while it is passing through the normal channels of commerce," *id.* at (i)(3) (emphasis added). Therefore, plaintiffs' excuse for rejecting the use of adhesive labels is inadequate under the regulations relating to affixation of notice.

While these regulations do not address efforts to cure omissions, there is no reason to assume that an acceptable method under section 401(c) would not be acceptable under section 405(a). Several courts, for instance, have found that the use of stickers or removable pressure-sensitive labels can constitute a reasonable effort to add notice and thus cure an omission or can at least raise sufficient factual questions to withstand a motion for summary judgment or support a motion for a preliminary injunction. *See, e.g., Innovative Concepts in Entertainment,* 576 F.Supp. at 460; *Beacon Looms, Inc. v. S. Lichtenberg & Co., Inc.,* 552 F.Supp. 1305, 1313 (S.D.N.Y.1982) (alternative holding); *Florists' Transworld Delivery Ass'n v. Reliable Glassware & Pottery Co.,* 213 U.S.P.Q. (BNA) 808, 811 (N.D. Ill. May 11, 1981) [Available on WESTLAW, 1981 WL 1376]; *P. Kaufman, Inc. v. Rex Curtain Corp.,* 203 U.S.P.Q. (BNA) 859, 860 (S.D.N.Y. June 14, 1978) [Available on WESTLAW, 1978 WL 986]. Furthermore, plaintiff's concern that the labels would be unacceptable under the copyright statute because they could be removed by potential infringers, *see* Plaintiffs' Opposition, Exhibit 7 (Oltra Deposition) at 169 & 191, is unfounded. Section 405(c) specifically provides that "[p]rotection under this title is not affected by the removal, destruction, or obliteration of the notice, without the authorization of the copyright owner, from any publicly distributed copies...."

Plaintiff's argument with respect to the unreasonableness of unpacking the figurines from their carefully-sealed boxes is also unavailing. First, the mere fact that added expense is involved does not relieve plaintiff of its burden under section 405(a)(2). *See Videotronics,* 586 F.Supp. at 483 ("Implicit in the concept of a 'reasonable effort' under § 405(a)(2) is the expectation that an expenditure of time and money over and above that required in the normal course of business will be made."). Plaintiff has made no showing that its expenses as to the boxes would have been unreasonable within the meaning of section 405(a)(2). Second, even if plaintiff had shown that unpacking and repacking would have been unreasonable, it has failed to show any effort to use reasonable alternatives. For instance, plaintiff could have avoided destroying the boxes by adding labels to those boxes in inventory and mailing labels to its distributors with instructions to affix them to the figurines or boxes. Such an effort *might*

ultimately have been deemed reasonable under the circumstances. *Cf. Beacon Looms,* 552 F.Supp. at 1313; *Florists' Transworld,* 213 U.S.P.Q. (BNA) at 811; *P. Kaufman,* 203 U.S.P.Q. (BNA) at 860. Finally, plaintiff alleges in its memorandum that "unpacking and repacking the pieces could have resulted in a not insignificant percentage of breakage." Plaintiffs' Opposition at 13. This statement is based on the testimony of Mr. Oltra. However, a review of Mr. Oltra's testimony reveals that the significant amount of breakage he was referring to was related to the idea of re-baking the pieces. *Id.* Exhibit 7 (Oltra Deposition) at 170. In terms of unpacking and re-packing, he testified merely that "[t]here is *possible* breakage upon taking [the figurines] out of the box[es]," *id.* (emphasis added), and that upon opening the boxes, "there *could* be breakage," *id.* at 171 (emphasis added). The mere possibility of some unspecified amount of breakage cannot excuse plaintiff from at least making an effort, particularly when there were apparently reasonable alternatives that could have been attempted.

Plaintiff also asserts that any attempt to add notice to pieces already shipped to defendant Weil and to U.S. retail stores would have been unreasonable. Plaintiffs' Opposition at 14. The Second Circuit has determined that the addition of notice to copies shipped to distributors and retailers but not yet distributed to the public is not a statutory requirement but is, rather, just one relevant factor to be considered in determining whether a copyright owner has made reasonable efforts to cure an omission. *See Shapiro,* 764 F.2d at 75 (citation omitted). While the Second Circuit in *Shapiro* held that the question is one of fact, that decision, which was premised on very different facts, does not preclude summary judgment in this case.

In *Shapiro,* the plaintiff had alleged that efforts to cure its defective notice on copies already shipped to its retailers would have been unavailing. *Id.* at 74–75. Furthermore, as discussed above, the plaintiff in *Shapiro* had included some form of notice, albeit defective, and had re-labeled those copies still in its possession. Thus, some effort had been made and the question became whether, taken as a whole, that effort was reasonable. *See id.* at 75.

Here, plaintiff has made no effort to cure its omission other than to add proper notice to copies manufactured after discovery of the omission. As discussed previously with respect to its inventory, plaintiff DAISA could have at least attempted to cure its omission by mailing labels or tags to its distributor and the U.S. retail outlets. Unlike the plaintiff in *Shapiro,* plaintiff here has failed to establish that any attempts to add notice to products already shipped would have been unreasonable or unavailing. *See id.* at 75; *see also Lifshitz v. Walter Drake & Sons, Inc.,* 806 F.2d 1426, 1434 (9th Cir.1986) (in finding plaintiff's copyright invalid because, *inter alia,* plaintiff made no attempt to add proper notice to copies shipped to its dis-

showing that other methods were considered and found unreasonable. Plaintiff's excuse for failing to cure the omission is therefore inadequate as a matter of law. Consequently, DAISA's copyrights on the works at issue in this action are forfeited and the works are injected into the public domain. Defendants' motion on this issue is granted.

### 2. Infringement

Because DAISA's works are unprotected by the Copyright Act, plaintiff's claim of infringement must fail as a matter of law. Therefore, defendants' motion for summary judgment is granted as to plaintiff's claim of infringement under sections 106 and 602(a) of the Copyright Act.

## V. TRADEMARK ISSUES

Defendants have moved for summary judgment on plaintiff Weil's three trademark causes of action. Plaintiff Weil has cross-moved for summary judgment on these claims.

## A. BACKGROUND

The following facts are largely undisputed unless otherwise indicated. In 1963, Weil began to import porcelain figurines manufactured by Lladro, S.A. This porcelain bore the trademark "Lladro" and a flower logo, which had been placed on the base of the goods in Spain by the manufacturer. In 1966, the foreign manufacturer designated Weil as its exclusive distributor in the U.S. and granted Weil the right to register the trademark in the U.S. in Weil's name. Weil filed an application with the U.S. Patents and Trademark Office ("USPTO") and on September 7, 1967, the USPTO registered the trademark.

In 1973, Lladro, S.A. acquired 50% of Weil, which had previously had no corporate relationship with the foreign manufacturer. At that time, Weil assigned its U.S. trademark registration to Lladro, S.A. In 1977, Lladro Exportadora, S.A. acquired all the shares of Weil. As mentioned earlier, Lladro Exportadora and Lladro, S.A. have

a common parent, Sodigei, S.A., a Spanish corporation. In 1983, Lladro, S.A. assigned back to Weil all rights in the U.S. trademark.

Lladro, S.A. sells its porcelain figurines to distributors in various countries. Defendant Karen–Leslie alleges that it purchases Lladro products in the U.S., primarily from a supplier that is an unrelated domestic corporation. Defendants' Memorandum at 5. Karen–Leslie orders the products from its supplier, which then acquires the products overseas from Lladro, S.A.'s foreign customers and imports them into the U.S. Karen–Leslie then sells these products to U.S. retailers.

## B. SECTION 1115(b) CLAIM

In count one of its complaint, plaintiff Weil asserts a claim pursuant to section 33(b) of the Lanham Act, 15 U.S.C. § 1115(b). In September 1984, plaintiff moved for summary judgment on this cause of action, arguing that the right to use the mark is incontestable under section 1065 and that defendants' acts violate its exclusive right to use the mark, giving rise to a cause of action under section 1115(b) that is distinct from a cause of action for infringement under section 1114. On February 22, 1985, at oral argument on this matter, plaintiff's motion was denied, the Court finding that section 1115(b) does not create an independent cause of action for trademark infringement. *See* Order dated April 23, 1985.

In August 1985, defendants moved for summary judgment on this cause of action arguing that the incontestability of a mark under section 1065 and the right to its exclusive use under section 1115(b), while creating an evidentiary presumption, do not give rise to an independent cause of action. Plaintiff Weil cross-moved for summary judgment on this issue, arguing that its exclusive rights, as provided under sections 1057(b), 1065, and 1115(b), had been violated.

For the reasons set forth below, plaintiff's cross-motion is denied and defendants' motion is granted.

tributor, court noted that while "[i]t is certainly possible that [the distributor], an independent entity, would have declined to cooperate with [the plaintiff manufacturer] in his efforts to add proper copyright notice to these copies," [t]he statute requires only that the plaintiff make a reasonable effort, not that he succeed).

■ At oral argument on February 22, 1985 and in the April 23, 1985 order, this Court expressly held that there is no independent cause of action provided by section 1115(b). Specifically, this Court determined that registration and incontestability under sections 1065 and 1115(b) merely give rise to a conclusive presumption of trademark validity and do not provide a mechanism for vindicating a violation of a trademark owner's rights nor a means of avoiding the problems inherent in establishing confusion under section 1114. This Court also determined that, contrary to plaintiff's interpretation, the Supreme Court's decision in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), provided no support for the argument that there is a basis for a cause of action under section 1115(b) that is distinct from an action brought under section 1114.

This Court's earlier determination is now the law of the case. The law of the case doctrine was examined in *Erie Conduit Corp. v. Metropolitan Asphalt Paving Association*, 560 F.Supp. 305 (E.D.N.Y.1983), in which the court quoted Justice Holmes' statement that the doctrine does not limit a court's power but "merely expresses the practice of courts generally to refuse to reopen what has been decided." *Id.* at 307 (quoting *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)). The court in *Erie Conduit* relied on an oft-cited Fifth Circuit decision for a summary of factors justifying departure from the general rule that a prior determination should remain undisturbed:

'[L]aw of the case' ... must be followed in all subsequent proceedings in the same case ... unless ... controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

*Id.* at 308 (quoting *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.1967)).

Relying on the above principles, this Court has reviewed the papers submitted for the current motions and has found no citation of any authority that would require a different result on this cause of action. Indeed, in the only case that appears to have addressed this issue subsequent to the February 22, 1985 oral argument, the same conclusion has been reached with respect to whether section 1115(b) provides an independent cause of action. *See Weil Ceramics & Glass, Inc. v. Dash*, 618 F.Supp. 700, 703–04 (D.N.J.1985); *see also* 4A R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 25.08, at 8–9 (4th ed. Supp.1987) (discussing import of Supreme Court's decision in *Park 'N Fly* and of its denial of certiorari in *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1247 (9th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985), in which Ninth Circuit rejected argument that incontestable mark should be enforced even without a showing of likelihood of confusion; concluding that "most likely inference is that the Court thinks that, although the incontestability of an infringed registration bars the defense of descriptiveness, it does not change the scope of infringement protection to which the registration is entitled. A confusingly similar relation between the marks and between the goods or services remains necessary."). There has also been no showing that this Court's prior decision was clearly erroneous or would work a manifest injustice. Accordingly, while this Court has the power to change its previous ruling, *see Blythe Industries v. Puerto Rico Aqueduct and Sewer Authority*, 607 F.Supp. 1386, 1388 (S.D.N.Y.1985) (citing *Corporacion De Mercadeo Agricola v. Mellon Bank*, 608 F.2d 43, 48 (2d Cir.1979)), it sees no reason to do so.

Furthermore, even if the Court were inclined to reconsider its previous ruling, defendants correctly point out that plaintiff has failed to show that section 1115(b) provides an express or implied right of action. *See* Reply Memorandum of Defendants at 1–2. This Court finds persuasive the conclusion and reasoning on this issue set forth in *Weil Ceramics*, 618 F.Supp. at 703–04. First, there is clearly no express right of action provided by the statute. *See id.* at 703. Second, applying the analysis required by *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); and *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979), there is no indication that Congress intended to create an independent cause of action under section 1115(b). *See Weil*, 618 F.Supp. at 703–04.

Accordingly, this Court reaffirms its earlier determination that there is no cause of action under section 1115(b). The Court finds unpersuasive the arguments raised in plaintiff's cross-motion, which are basically a reiteration of its earlier arguments, and, if anything, the Court is more firmly convinced, in light of *Weil Ceramics,* that its earlier ruling was correct.

## C. SECTION 1114 CLAIM

In Count Two of its complaint, plaintiff Weil asserts that defendants' importation, distribution, and sale in the United States without Weil's authorization of porcelain bearing the Lladro trademark infringes on plaintiff's rights in violation of section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a). In September 1984, plaintiff moved for summary judgment on this cause of action. At oral argument on February 22, 1985, plaintiff's motion was denied. *See* Order dated April 23, 1985 (denying plaintiff's motion on this cause of action because "[t]here are genuine issues as to material facts concerning trademark infringement under Section 1114").

In August 1985, defendants moved for summary judgment on this cause of action arguing that their sale of "genuine, first quality Lladro figurines placed in the stream of international commerce by the Lladro Group of which the alleged U.S. trademark owner [, Weil,] is a member," Defendants' Memorandum at 2–3, is authorized, at least implicitly, and cannot, as a matter of law, cause confusion. Therefore, defendants argue that plaintiff cannot maintain an infringement action pursuant to section 1114. Plaintiff Weil cross-moved for summary judgment arguing, among

**9.** Section 1114(1)(a) provides that:
(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause a mistake, or to deceive ... shall be liable in a civil action by the registrant....
As a preliminary matter, the Court notes that ownership of the mark is not contested in this motion, *see* Defendants' Memorandum at 14 n. 3, although the issue had been raised by defend-

other things, that the sale of "genuine" goods in the United States without the consent of the U.S. trademark owner can infringe the rights of the U.S. trademark owner, and that as a matter of law and fact, defendants' activities have caused confusion and have violated Weil's rights.

For the reasons set forth below, defendants' motion for summary judgment is denied and plaintiff's cross-motion for summary judgment is denied.

█ In order to prevail on its section 1114 infringement claim, plaintiff must show that (1) defendants are using the trademark without plaintiff's consent (2) in connection with the sale of goods and (3) in a manner that is likely to cause confusion.[9] *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir.1968); *accord El Greco Leather Products Co. v. Shoe World, Inc.,* 599 F.Supp. 1380, 1390 (E.D.N.Y.1984), *rev'd on other grounds,* 806 F.2d 392 (2d Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). The parties do not dispute the second element required for a successful infringement claim but do vigorously dispute the other two elements.[10]

### 1. Consent

Plaintiff Weil, in support of its original motion for summary judgment, argued that defendants' sale and distribution in the United States of products bearing the Lladro trademark is unauthorized by Weil. Defendants, in opposition to plaintiff's motion, argued that there is a genuine issue as to whether their sale and distribution of "genuine" Lladro porcelain is directly or indirectly authorized by Weil. Relying in

ants in their opposition to plaintiff's original motion for summary judgment. Because the validity of the mark is not being challenged, the Court merely notes that registration of the trademark is *prima facie* evidence of its validity and of the holder's exclusive right to use it. *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.,* 816 F.2d 68, 71 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987).

**10.** Interestingly, in *Weil Ceramics,* involving the same issues and the same plaintiff but different defendants, the defendants conceded that they had used the mark in U.S. commerce without Weil's consent. 618 F.Supp. at 704.

part on the reasoning of *Parfums Stern, Inc. v. United States Customs Service,* 575 F.Supp. 416 (S.D.Fla.1983), defendants argued in essence that although Weil has not authorized defendants' sale and distribution, there is an issue as to whether the "Lladro Group," [11] of which Weil is a member, "can and does authorize this activity by its sale of such products in the international stream of commerce." Defendants' Memorandum in Opposition to Plaintiff Weil Ceramics & Glass, Inc.'s Motion for Summary Judgment at 37. At oral argument on February 22, 1985, this Court held that there were questions of material fact raised by defendants' "enterprise" argument in support of their allegations that they are at least implicitly authorized to sell Lladro porcelain in the U.S. This Court therefore denied plaintiff's motion for summary judgment.

A very recent decision by the Second Circuit has now persuaded this Court that defendants' argument is not tenable. In *Original Appalachian Artworks Inc. v. Granada Electronics Inc.,* 816 F.2d 68 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), the court determined that the reasoning of *Parfums Stern* has "some force" only "where the imported goods are identical to the domestic goods and *are intended for sale in the United States.*" *Id.* at 73 (emphasis added).[12] While the court in *Original Appalachian* discussed the *Parfums Stern* reasoning only in the context of the issue of likelihood of confusion, the Second Circuit's narrow construction of *Parfums Stern* seems equally applicable to the issue of authorization. Therefore, defendants cannot rely on an "enterprise" theory to establish authorization.

Other aspects of the *Original Appalachian* opinion, which reviewed several recent grey market cases in this circuit, also reinforce the conclusion that defendants cannot rely on an "implicit authorization" argument. In several instances, the Second Circuit distinguished between those cases involving goods that were intended for sale in the U.S. and those involving goods that were not. Thus, it appears that the intent of the trademark holder with respect to the distribution of the goods is of some importance.

Based on a review of the papers submitted for the earlier motion and for the current motions, this Court finds that while a small percentage of the goods sold by defendants have been purchased from authorized Weil retail dealers, most have been purchased by defendants from sources unauthorized by Weil and most were never intended to be sold in the United States. Accordingly, defendants do not have implicit or explicit consent or authorization from the U.S. trademark owner to distribute and sell in the U.S. the vast majority of the goods bearing the Lladro mark that they have been or are distributing and selling in the U.S. At trial, of course, the parties will be free to offer evidence as to the amount of goods that are or were authorized for distribution by plaintiff Weil for the purpose of determining plaintiff's damages.

#### 2. Likelihood of Confusion

The "heart of a successful claim" for trademark infringement under section 1114 is a "showing of likelihood of confusion as to the source or sponsorship of a defendant's products." *Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir.1982) (citations omitted); *accord Miss Universe, Inc. v. Patricelli,* 753 F.2d 235, 237 (2d Cir.1985). As mentioned above, defendants strenuously argue in their motion for summary judgment that their sale and distribution of "genuine first quality" Lladro porcelain cannot cause confusion as to source and that plaintiff therefore cannot prevail in its cause of action pursuant to section 1114.

As a preliminary matter, this Court notes that defendants' assertion that the sale of "genuine" Lladro products precludes any possibility of confusion as to source of origin and therefore bars an action for infringement misperceives an im-

---

**11.** The Court is cognizant of plaintiffs' objection to the term "Lladro Group," and recognizes that there is no entity with that name. Not seeing any "sinister" connotation in it, the Court uses the term merely for convenience.

**12.** See discussion *infra* with respect to whether the goods are identical.

portant element of trademark law. The concept of likelihood of confusion is not limited solely to confusion as to source of origin but rather encompasses any kind of likelihood of confusion. *See Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 568 (2d Cir.1971); *accord Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979). Of particular relevance in the context of grey market goods is the concept of likelihood of confusion as to "sponsorship" —that is, confusion as to the identity of the company that stands behind or insures the quality of the trademarked goods. *See Weil Ceramics,* 618 F.Supp at 705 (citing *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 548 F.Supp. 1063, 1071 (E.D.N.Y.1982), *preliminary injunction vacated on other grounds,* 719 F.2d 42 (2d Cir.1983)); *see generally Original Appalachian,* 816 F.2d at 74–76 (Cardamone, J., concurring) (distinguishing between trade identity theory and guarantee function of trademark law). Accordingly, even if there were no possibility of confusion as to source of origin when a product is "genuine," there might still be confusion as to sponsorship when a "genuine" product is manufactured by a foreign manufacturer but distributed in the U.S. without the authorization of and in competition with the U.S. trademark owner. *See, e.g., Weil Ceramics,* 618 F.Supp. at 704–06 (concluding that genuine goods may cause confusion); *but see NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506, 1509–10 (9th Cir.1987) (unauthorized sale of "genuine" goods cannot cause confusion when U.S. trademark holder and foreign manufacturer are related).

As to the merits of defendants' motion, two recent decisions by the Second Circuit persuade this court that the motion must be denied. In *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392 (2d Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), the court considered the issue of whether goods manufactured by a foreign company under an agreement with the U.S. trademark holder but distributed in the U.S. without the authorization of the U.S. trademark holder can be considered "genuine" for purposes of the Lanham Act. In holding that such goods are not genuine, the court relied on the notion that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Id.* at 395 (citation omitted). In particular, the court noted that "the actual quality of the goods is irrelevant; it is the *control* of quality that a trademark holder is entitled to maintain." *Id.* (emphasis added) (citation omitted). In *El Greco,* the plaintiff trademark holder had specified in its agreement with the defendant manufacturer that merchandise could not be distributed in the U.S. until the plaintiff had inspected it to ensure quality. *Id.* Because the inspection was an integral part of the plaintiff's quality control effort and because the goods were distributed without inspection, the court determined that the goods were not genuine and that the defendant's acts were therefore violative of section 1114. In so holding, the court specifically noted that "[t]he mere act of ordering a product to be labeled with a trademark does not deprive its holder of the right to control the product and the trademark." *Id.* at 395–96. The court declined to decide whether the unauthorized sale of "genuine" goods could give rise to a likelihood of confusion. *Id.* at 395.

In *Original Appalachian, supra,* the court considered the issue of whether the unauthorized distribution in the U.S. of goods that are manufactured abroad under a license from the U.S. trademark owner restricting the territory in which the foreign goods may be distributed can infringe on the trademark holder's rights. In holding that the U.S. trademark holder's rights had been violated even though the defendant importer's goods bore a "genuine" trademark portraying the U.S. trademark holder as the originator, the Second Circuit emphasized two factors: first, the foreign goods at issue were materially different from the U.S. goods and were therefore not "genuine" even though their manufacture and distribution abroad had been "authorized" by the U.S. trademark holder; second, the foreign goods had never been intended for distribution in the U.S.

In light of these two decisions and based upon a review of the papers submitted by the parties, it is clear that defendants' motion must be denied for two reasons: first as discussed above, the goods at issue were never intended for sale in the U.S. and second, there is an unresolved question of

fact as to whether the goods distributed by defendants are identical to the goods distributed by plaintiff. For purposes of this motion, plaintiff has not alleged that the goods are counterfeit. Plaintiff has submitted sufficient support for its allegations to raise a fact question and thus to preclude an award of summary judgment for defendants.

Plaintiff's cross-motion for summary judgment on this issue, in contrast to defendants', raises issues that are not as easily resolved. Plaintiff argues, in effect, that even if the goods originate from a common source and even if the goods are identical rather than merely confusingly similar, defendants' unauthorized distribution in the U.S. nevertheless infringes plaintiff's exclusive rights as the U.S. trademark holder. *El Greco* and *Original Appalachian* do not directly address this issue in the factual context of this case which, among other things, involves a corporate relationship between the foreign manufacturer, Lladro, S.A., and the U.S. trademark holder, Weil.[13] In both *El Greco* and *Original Appalachian*, the goods were not deemed to be "genuine" and the U.S. trademark holder and the foreign manufacturer were separate corporate entities.

In light of *Original Appalachian*, however, plaintiff's cross-motion for summary judgment must be denied because there is an unresolved threshold fact question as to whether defendants' goods are identical to plaintiff's. Furthermore, the Court believes that in light of *El Greco, Original Appalachian*, and other recent gray market decisions, the parties should have an opportunity to address these issues again if renewed motions for summary judgment are deemed desirable.

## D. UNAUTHORIZED IMPORTATION CLAIM

In the third count of its complaint, plaintiff Weil asserts a claim pursuant to section 42 of the Lanham Act of 1946, 15 U.S.C. § 1124, and section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526.

Defendants, in their motion for summary judgment, argue that these two statutes are inapplicable to their activities because they are not importers. Defendants also argue that in light of the long-standing interpretation of these statutes by the Customs Service and by the court in *Parfums Stern, supra,* with respect to nonexclusion of goods when the U.S. trademark holder is affiliated with the foreign manufacturer of the goods, these statutes should not be applicable even if defendant Karen–Leslie were an importer. Defendants' Memorandum at 18–20. In opposition to defendants' motion and in support of its cross-motion, plaintiff Weil explicitly addresses defendants' first argument only in two brief statements: (1) "[t]he defendants are liable as importers because they have both contributed to and induced the importation of unauthorized imports," Plaintiffs' Opposition at 73, and (2) "the fact that defendants do not themselves import the infringing copies does not insulate them from infringing Weil's U.S. trademark rights," *id.* at 2. The only other reference to this issue appears in the complaint in which plaintiff alleges that defendants "have imported, caused to be imported, or conspired with the importers of" the merchandise at issue. Complaint ¶¶ 52, 54. With respect to defendants' second argument that plaintiff has no legally recognizable rights to exclude others from importing "genuine" goods, plaintiff argues that these two statutes do prevent the unauthorized importation of goods made by a foreign manufacturer bearing a genuine foreign trademark that is identical to the U.S. trademark. In support of its contention, plaintiff argues that by providing exceptions to the exclusion of "genuine" goods in two other statutory provisions, 48 U.S.C. § 1643 (the Virgin Islands Exception) and 19 U.S.C. § 1526(d)(1) (the personal use exception), Congress must have intended sections 1124 and 1526 to provide a means in all other

---

**13.** While the parties dispute whether Weil is "controlled" by the "Lladro Group," *compare* Plaintiff's Opposition at 64–66 *with* Defendants' Reply at 3–5, there is no dispute that Lladro Exportadora, S.A., which owns 100% of Weil, and Lladro, S.A., the manufacturer of Lladro porcelain, are commonly owned by the same corporate parent, Sodigei, S.A., a Spanish corporation. *See* Plaintiff's Opposition at 33 & 64; Memorandum and Order dated Feb. 18, 1986 (Mag. Scheindlin) at 2; text accompanying note 1 *supra.*

situations for U.S. trademark holders to exclude the unauthorized importation of "genuine" goods. Plaintiff also cites several cases in support of its arguments that "genuine" goods may be excluded.

### 1. Section 1124

Section 42 of the Lanham Act, 15 U.S.C. § 1124, provides in relevant part that "no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter ... shall be admitted to entry at any customhouse of the United States." The Second Circuit has taken a very narrow view of the protection afforded private litigants under this statute. In *Olympus Corp. v. United States*, 792 F.2d 315, 321–22 (2d Cir.1986), *petition* for cert. filed, 55 U.S.L.W. 3392 (Nov. 6, 1986), the court determined that "[t]he plain language of the statute does not bar importation if the goods are genuine, only if they 'copy or simulate' a trademark." *Id.* at 321. Thus, "[a]bsent the *Katzel* situation," which involved a U.S. trademark holder that was completely independent from the foreign manufacturer, "section 1124 applies only to merchandise bearing counterfeit or spurious trademarks that 'copy or simulate' genuine trademarks." *Id.*

▇▇ Plaintiff has not alleged that the goods distributed by defendants bear a counterfeit or spurious trademark. While plaintiff could conceivably raise the argument under the reasoning of *El Greco* and *Original Appalachian, see* discussion *supra*, that the trademark on the goods distributed by defendants is not "genuine" because the goods may not be identical, this argument seems to be foreclosed by *Olympus.* Read literally, Olympus precludes a claim under section 1124 unless the goods bear a counterfeit mark. *Accord Lever Brothers v. United States*, 652 F.Supp. 403, 406–07 (D.D.C.1987); *American Honda Motor Co., Inc. v. Carolina Autosports Leasing and Sales, Inc.*, 645 F.Supp. 863 (W.D.N.C.1986). Accordingly, defendants' motion for summary judgment

is granted and plaintiff's cross-motion is denied.[14]

### 2. Section 1526

Section 526(a) of the Tariff Act, 19 U.S.C. § 1526(a), prohibits the importation of merchandise bearing a registered trademark owned by a U.S. trademark holder unless the U.S. trademark holder has consented in writing. In ruling on the current motions, it is unnecessary to discuss the validity of the regulations promulgated by the U.S. Customs Service under this statute and under section 42 of the Lanham Act with respect to imports of "genuine" goods when the foreign manufacturer and domestic U.S. trademark holder are related entities, an issue that has divided the courts, *compare Olympus Corp.*, 792 F.2d at 319–21 (upholding validity of regulations) *and Vivitar Corp. v. United States*, 761 F.2d 1552, 1568–71 (Fed.Cir.1985) (same), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986) *with Coalition to Preserve the Integrity of American Trademarks v. United States*, 790 F.2d 903, 905 (D.C.Cir.1986) (finding regulations invalid), *cert. granted sub nom. K Mart Corp. v. Cartier, Inc.*, —— U.S. ——, 107 S.Ct. 642, 93 L.Ed.2d 699 (1986), because the statute provides a judicial remedy distinct from the administrative enforcement mechanism.

▇▇ Defendants' motion for summary judgment must be denied for two reasons. First, defendants' reading of the statute is far too narrow; liability is not limited to importers only. While subsection (a) bars importation and might be construed to apply only to importers, subsection (c) specifically provides a remedy against "[a]ny person *dealing* in any such merchandise." 19 U.S.C. § 1526(c) (emphasis added). A distributor clearly "deals" in merchandise and thus may be liable under the statute. Second, while the Customs Service has determined that it will not exclude merchandise bearing a "genuine" mark when the foreign manufacturer and U.S. trademark holder are related entities, *see* 19 C.F.R. § 133.21(c)(2), and these regulations have been upheld by the Second

---

**14.** Because of the result reached under the authority of Olympus, it is unnecessary to address the other arguments raised by the parties. The Court notes, however, that the parties have provided no support for their arguments with respect to whether section 1124 provides a cause of action against distributors as well as importers.

Circuit, see *Olympus*, 792 F.2d at 319–21, the Second Circuit has nevertheless found that "Customs' interpretation of the statute does not limit the reach of protection of section 526" of the Tariff Act, *id.* at 320. Specifically, the Second Circuit has determined that notwithstanding the interpretation used by Customs, a U.S. trademark holder may still pursue private remedies under section 1526(c). *See id.; accord Original Appalachian*, 816 F.2d at 71; *Vivitar*, 761 F.2d at 1569; *Dial Corp. v. Encina Corp.*, 643 F.Supp. 951, 955–56 (S.D.Fla.1986). Therefore, defendants may be liable notwithstanding the exception provided by the regulations.

Plaintiff's cross-motion must also be denied. A threshold requirement for protection under section 526(a) is that a copy of the certificate of registration of the trademark be filed and recorded with the Department of the Treasury. *See* 19 U.S.C. § 1526(a); *see also* 15 U.S.C. § 1124; 19 C.F.R. § 133.2. Plaintiff alleges that it has complied with the filing requirements of 19 U.S.C. § 1526(a), *see* Complaint ¶ 51, but defendants deny this allegation, *see* Answer and Counterclaim ¶ 51. The Court has searched in vain through the many documents on file in this action for any evidence of plaintiff's compliance. While the search has revealed an admission by counterdefendants in this action that the registration of the trademark was recorded with the U.S. Customs Service as number 84–72, dated April 20, 1984, *see* Reply to Counterclaim ¶ 15, it has not revealed any document showing this recordation.[15]

Because there is a genuine issue of material fact as to plaintiff's compliance with this statutory requirement, plaintiff's cross-motion for summary judgment must be denied.

## VI. ANTITRUST ISSUES

In its counterclaim, counterplaintiff Karen-Leslie Co., Inc. ("Karen–Leslie") asserts that counterdefendants DAISA, Weil, and Lladro, S.A. have violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[16] Karen–Leslie asserts that counterdefendants have conspired among themselves and with their authorized retailers in the U.S. and with others to restrain trade, monopolize, and attempt to monopolize the sale and distribution of Lladro figurines in the U.S. Karen–Leslie alleges that counterdefendants have committed the following acts with the specific intent of furthering their illegal conspiracy: falsely marked Lladro figurines with copyright notice when these figurines are uncopyrightable, misused valid copyrights and overwhelming economic power by bringing infringement actions in an attempt to prevent the importation and sale of these figurines by defendants and others; acted with their retailers to boycott Karen–Leslie; and attempted to use the Lladro trademark registration to block the importation of Lladro by anyone other than Weil. Karen–Leslie alleges that the effect of these acts has been a reduction in competition in the sale and distribution of the figurines and an artificially raised and maintained resale price.

Early in 1984, counterdefendants moved to dismiss the counterclaims. The motion was denied at oral argument on April 6, 1984. *See* Order dated May 7, 1984. Counterdefendants have now moved for summary judgment. For the reasons set forth below, counterdefendants' motion is granted in part and denied in part.

## A. THE RELEVANT MARKET

The parties hotly contest the appropriate definition of the relevant market. This dis-

---

**15.** Defendants submitted a July 30, 1976 Memorandum from the U.S. Customs Service finding that the Lladro trademark was owned by a foreign corporation by virtue of Weil's assignment to Lladro, S.A. and concluding that merchandise bearing the Lladro mark could therefore be imported by anyone. *See* Counterplaintiff's Motion for Summary Judgment on the Antitrust Counterclaim, Exhibit 4. Presumably, plaintiff's 1984 recording would reflect Lladro's

assignment back to Weil and would indicate that Weil is the U.S. trademark owner.

**16.** Defendants filed an answer and counterclaim to DAISA's copyright complaint on Dec. 14, 1983 and an answer and counterclaim to Weil's trademark complaint on May 25, 1984. The counterclaims are virtually identical. Paragraph 19 of the counterclaims was amended on March 4, 1985.

pute is critical because a determination with respect to the relevant market is an essential prerequisite to analyzing most of the claims raised by Karen–Leslie under both sections 1 and 2 of the Sherman Act.

The parties have agreed that the relevant geographic market is the United States. *See* Counterclaim ¶ 7; Counterdefendants' 3(g) Statement ¶ 13. There is no agreement, however, with respect to the relevant product market. Counterdefendants assert that the relevant product market consists of retail giftware, *see id.,* whereas Karen–Leslie asserts that the relevant market consists of Lladro porcelain figurines, *see* Counterplaintiff's 3(g) Statement ¶ 5, or Lladro and Hummel porcelain figurines, *see id.* ¶ 6, or possibly all figurines, *see* Counterplaintiff's Memorandum in Opposition to Counterdefendants' Motion for Summary Judgment on the Antitrust Counterclaim at 35. The parties have not sufficiently clarified whether they are referring to the retail or wholesale market.

The classic test for defining the product market was enunciated by the Supreme Court in *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The Court stated that the "market is composed of products that have *reasonable interchangeability* for the purpose for which they are produced—price, use and qualities considered." *Id.* at 404, 76 S.Ct. at 1012 (emphasis added). The Court also emphasized the importance of the purchaser's *willingness to substitute* one commodity for another, *id.* at 393, 76 S.Ct. at 1006, or what is referred to as "cross-elasticity of demand," *see generally Hayden Publishing Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 70–71 (2d Cir.1984); 2 P. Areeda & D. Turner, *Antitrust Law* § 519a (1978); 3 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* § 8.02[2][a] (1986).

■ Relying upon these factors, this Court finds that neither party has conclusively defined the relevant product market. Counterdefendants' assertion that the relevant market is giftware is overly broad. As Karen–Leslie points out, that definition might include such products as mugs, lighters, adult games, and myriad other products that do not appear to be reasonable substitutes for Lladro porcelain, which is high-priced in comparison and is alleged to

be a "collectible." On the other hand, Karen–Leslie's definitions of the market—(1) Lladro porcelain or (2) Lladro and Hummel porcelain or (3) all figurines—appear too narrow and are contradicted by the deposition testimony found in counterdefendants' Reply Memorandum, which indicate that there are at least several types of figurines, including porcelain, crystal and other materials, and possibly several types of giftware, such as nonfigurine crystal and china, that compete in the same market as Lladro porcelain figurines. Based upon these submissions, the Court is unable to determine what the relevant market is and must instead conclude that there is an unresolved issue of fact.

Nevertheless, there are some determinations that can be made from the record. As a preliminary matter, the Court notes that the dispute between the parties rests, in part, on whether one brand can constitute a relevant market. While such a conclusion might be possible, based on a finding of uniqueness and a finding that there is no substitute that consumers will accept, Karen–Leslie has cited no authority in which such a conclusion has been reached. In *duPont, supra,* the Supreme Court emphasized the distinction between a manufacturer's natural monopoly over its own product and its ability to wield monopoly power in the relevant market. The Court stated that:

> Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or softdrink manufacturers have over their *trademarked products* is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

351 U.S. at 393, 76 S.Ct. at 1006 (emphasis added) (footnotes omitted).

Since *duPont,* numerous courts have determined that, absent special circumstances, a particular brand either did not or could not constitute the relevant market in section 2 cases, *see, e.g., Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 488–89 (5th Cir.1984) (in absence of recognized exceptions, one brand in market

place of competing brands cannot be deemed relevant product market for purposes of section 2 of Sherman Act); *Proctor v. General Conference of Seventh–Day Adventists*, 651 F.Supp. 1505, 1525 (N.D.Ill. 1986) ("Seventh–Day Adventist literature is not a relevant market or submarket; it is a product."); *cf. Island Tobacco Co. v. R.J. Reynolds Industries, Inc.*, 513 F.Supp. 726, 744 (D.Hawaii 1981) ("Every manufacturer has a natural monopoly in the sale and distribution of his own product, especially when the product is sold under a trademark.") (citations omitted); *Speed Auto Sales, Inc. v. American Motors Corp.*, 477 F.Supp. 1193, 1197 (E.D.N.Y.1979) ("[e]very manufacturer has a natural and complete monopoly over his particular product, especially when sold under his own private brand or trade name") (quoting *Schwing Motor Co. v. Hudson Sales Corp.*, 138 F.Supp. 899, 902 (D.Md.), *aff'd*, 239 F.2d 176 (4th Cir.1956), *cert. denied*, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957)); and in section 1 cases, *see, e.g., Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295–96 (5th Cir. Unit A 1981) (plaintiff's "fundamental mistake throughout this case has been to view the product market as confined to Zenith sets" as opposed to all available brands of television sets when record contained no evidence that "Zeniths are unique or that Zenith dealers enjoy a downward sloping demand curve for their sets").

The deposition testimony taken from witnesses named by Karen–Leslie not only reveals no support for finding that Lladro figurines should be deemed to constitute the relevant product market, *see* Counterdefendants' Reply to Counterplaintiff's Memorandum in Opposition to Counterdefendants' Motion for Summary Judgment on the Antitrust Counterclaims, Exhibits F, J, K, L, M, N, O, P, & Q, but rather supports just the opposite conclusion. Karen–Leslie has made no showing that Lladro falls within the exceptions to single-brand definitions recognized by some courts. *See, e.g., Domed Stadium*, 732 F.2d at 488–89 & n. 9 (discussing exceptions). Therefore, it is clear that the relevant market does not consist of Lladro by itself.

With respect to Karen-Leslie's second market definition—Lladro and Hummel porcelain—the Court finds that while there is some support in the record for this definition, it is not conclusive nor even persuasive. However, assuming for the moment that this definition is appropriate, counterdefendants have submitted information showing that Weil's sales of Lladro, translated into a retail sales figure, for the calendar year of 1984 were approximately $40 million, *see* Counterdefendants' Memorandum, Exhibit L, ¶ 9, while retail sales of Hummel were estimated to be between $140 and $180 million, *see* Counterdefendants' Reply, Exhibit R, ¶ 2. There is no indication of the year that Hummel estimates cover.

Karen-Leslie has not disputed these figures and the Court is tempted to accept them as the appropriate definition, particularly as Karen-Leslie's third alternative— all figurines—would leave Weil with an even smaller share of the market and thus could not provide support for Karen-Leslie's antitrust claims. *See, e.g.,* Counterdefendants' Memorandum, Exhibit L, ¶ 7 (providing annual sales figures for several other brands of figurines). However, the sales figures before the Court do not relate to the time period at issue, *see* discussion *infra*, and the Court thus is unable to determine what the structure of the market was during the relevant time period of 1978–81. The parties are advised that with respect to any renewed motion for summary judgment, the issue of market definition is critical.

Karen–Leslie, of course, has the ultimate burden of establishing the definition of the relevant market in its section 2 claims, *see, e.g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 840 (2d Cir.1980); *accord C.E.D. Mobilephone Communications, Inc. v. Harris Corp.*, 1985–1 Trade Cas. (CCH) ¶ 66,-386, at 64,897 (S.D.N.Y. Jan. 14, 1985), [Available on WESTLAW, 1985 WL 193], and in its section 1 claims, *see, e.g., Hayden Publishing*, 730 F.2d at 69–70 ("Among the most important circumstances to be considered [under the 'rule of reason'] are those relating to the competitive characteristics of the relevant market."); *accord Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*, 641 F.Supp. 1179, 1189 (S.D.N.Y.1986), unless

its showing falls within the standard enunciated in *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *see* note 35 *infra*. On counterdefendants' motion for summary judgment, however, the burden is on counterdefendants to show that there is no disputed issue of fact. *Hayden Publishing*, 730 F.2d at 70. Accordingly, Karen-Leslie's failure to define the market adequately or to demonstrate the anticompetitive effects upon that market of counterdefendants' alleged illegal conduct is not fatal on this motion. *Id.*

## B. SECTION 1 CLAIMS

Karen-Leslie asserts that counterdefendants have violated section 1 of the Sherman Act by conspiring to restrain trade. Karen-Leslie has not separated its section 1 and section 2 claims, but a liberal construction of the complaint reveals that, in essence, Karen-Leslie is asserting that counterdefendants engaged in a retail price maintenance scheme and that as part of this scheme, Karen–Leslie was subjected to a group boycott or illegal refusal to deal. Karen-Leslie asserts that this scheme involved both a horizontal and vertical restraint of trade.

■ Section 1 of the Sherman Act proscribes "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because all commercial contracts, by their very nature, restrain trade to some extent, the broad pro-

hibition of section 1 has been construed to apply to only those agreements that unreasonably restrain trade. *See, e.g., Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Thus, to sustain a claim under section 1, Karen-Leslie must establish (1) that counterdefendants entered into a contract, combination, or conspiracy, and (2) that the conspiracy effected an unreasonable restraint on trade. 15 U.S.C. § 1; *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987).

■ Furthermore, to pursue a private claim for damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and for injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, Karen–Leslie must show that it has suffered or is threatened with suffering antitrust injury and that it has standing under each statute to bring this action. *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 489–91, 93 L.Ed.2d 427 (1986).[17]

Counterdefendants assert that Karen-Leslie has failed to meet its burden with respect to all three elements necessary to sustain its section 1 claim—that is, (1) that there was concerted activity (2) that unreasonably restrained trade (3) and caused antitrust injury to Karen-Leslie. Counterdefendants also assert that Karen-Leslie lacks standing to bring its claim.[18] Be-

---

17. Similarly, to obtain relief under sections 4 and 16 of the Clayton Act for the alleged violations of section 2 of the Sherman Act, Karen–Leslie must have suffered or be threatened with suffering an antitrust injury. *See, e.g., Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir.1986); *Garshman v. Universal Resources Holding, Inc.*, 625 F.Supp. 737, 745 (D.N.J.1986), *aff'd*, 824 F.2d 223 (3d Cir.1987). Because of the Court's conclusion with respect to the inappropriateness of discussing the merits of the section 2 claims, *see* discussion *infra*, the Court will not reach the issues of injury and standing on these claims at this time. Upon a renewed motion for summary judgment, if any is made, the parties are reminded that these issues are critical.

18. While the doctrines of antitrust injury and antitrust standing are often confused, they in-

volve distinct inquiries as to the scope of liability under the antitrust laws. *See, e.g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728, n. 7, 97 S.Ct. 2061, 2065–66, n. 7, 52 L.Ed.2d 707 (1977); Page, "The Scope of Liability for Antitrust Violations," 37 *Stan.L.Rev.* 1445, 1484 (1985). Nonetheless, the policies behind both doctrines are related. *See id.* at 1484 & 1511–12. As the Second Circuit has stated, "[b]oth concepts ... share a common ingredient, 'confin[ing] recovery to those who have been injured by restraint on competitive forces in the economy.'" *Triple M Roofing Corp. v. Tremco, Inc.* 753 F.2d 242, 247 (2d Cir.1985) (quoting *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752, 758 (2d Cir.1972)).

The parties to this suit have displayed a certain amount of confusion in their analyses of these issues, which is understandable given the confusion shown by the courts. To simplify matters, the Court will adopt the suggestion of

cause the injury and standing issues are dispositive as to some of the claims asserted by Karen-Leslie, the Court will deal with these issues first.

### 1. Standing and Injury
### (a) Section 4 of the Clayton Act

#### (1) Injury

■ Section 4 of the Clayton Act provides in relevant part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" for treble damages. 15 U.S.C. § 15(a). This expansive language has been construed to require a showing that the alleged loss is "of the type the antitrust laws were intended to prevent and that flows from that which makes [a defendant's] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Thus, a plaintiff must show not only that there is an antitrust violation, but also that there is a causal connection between the violation and the alleged injury and that the defendant's activities had the effect of stifling competition. *See, e.g., Midwestern Waffles, Inc. v.*

*Waffle House, Inc.*, 734 F.2d 705, 722–23 (11th Cir.1984).

■ In this case, Karen-Leslie asserts that it has been injured by a vertical resale price maintenance scheme, a horizontal price-fixing scheme, and a boycott or concerted refusal to deal.[19] Assuming for the moment that Karen-Leslie could successfully show an illegal vertical or horizontal price-fixing agreement, either of which would be a *per se* violation of the antitrust laws, *see, e.g. Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 760, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984), Karen-Leslie nevertheless could not recover damages for either of these violations because Karen-Leslie would be unable to show that it had been injured by these practices. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986). Specifically, as Weil's competitor in the wholesale market, Karen-Leslie would stand to gain from any conspiracy to raise retail market prices through vertical resale price maintenance. *See id.* With respect to the alleged horizontal price-fixing agreement among retailers, some of which acted as suppliers to Karen-Leslie during the time period at issue,[20] Karen-Leslie has not

Professor Page and focus on antitrust injury first, *see* Page, *supra*, at 1484, especially as the injury analysis forms a necessary part of the standing analysis, *see, e.g., Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

19. Karen-Leslie's complaint and memorandum in opposition to counterdefendants' motion do not provide much guidance for the Court as to whether the alleged boycott/refusal to deal is horizontal or vertical. Because its allegations with respect to the existence of a horizontal conspiracy relate only to the alleged price-fixing scheme and because the record does not provide sufficient support to conclude that there was a horizontal group boycott, the Court will focus on the theory that the allegedly illegal boycott or refusal to deal was vertical. *Cf. Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) ("antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case"). This conclusion is particularly warranted in light of the Supreme Court's admonition in *Matsushita* "that if the factual context renders the [plaintiff's] claim implausible—if the claim is one that simply makes no

economic sense—[the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id.* at 587, 106 S.Ct. at 1356. In this case, a horizontal boycott makes little economic sense, at least in terms of those retailers that had previously sold Karen–Leslie their overstock. Those retailers presumably would have little incentive to boycott a longstanding customer. Furthermore, there would appear to be no motive for the other retailers that were not Karen-Leslie's suppliers to institute a boycott of Karen–Leslie because Karen-Leslie is not a competitor and is thus not threatening them with price competition. Therefore, it appears that the only refusal to deal that makes economic sense is a vertical one, instituted and enforced, if at all, by Weil.

20. At oral argument on October 11, 1985, Karen–Leslie conceded that the relevant time period for the purpose of its counterclaim was 1978–1981, the period during which the authorized retailers refused to sell Lladro to Karen–Leslie and during which Karen–Leslie had no other available source. From 1981 to the present, Karen–Leslie has been purchasing Lladro from an independent source. *See* Counterplaintiff's Memorandum, Exhibit R. At the hearing, Kar-

shown any injury because it has admitted that it never purchased at the full suggested retail price. *See* Counterdefendants' Memorandum of Points and Authorities in Support of the Motion for Summary Judgment Regarding the Antitrust Issues; and For Dismissal of the Counterclaims, Exhibit O. Indeed, although Karen-Leslie argues in its papers that there is an illicit horizontal price-fixing agreement, it did not assert such a scheme in its counterclaim and it has not addressed the issue of how it could have been injured by the alleged scheme.

The real harm suffered by Karen-Leslie, if any, was caused by the alleged boycott or concerted refusal to deal, which Karen-Leslie argues was instituted as part of an overall scheme to maintain prices. Thus, to withstand counterdefendants' motion for summary judgment, Karen-Leslie must show an injury resulting from the alleged boycott or refusal to deal. Evidence of a price-fixing conspiracy, by itself, would not be sufficient even if the alleged boycott or refusal to deal were deemed part of the larger price-fixing conspiracy because Karen-Leslie has suffered no injury from the alleged price-fixing. Rather, evidence of a price-fixing conspiracy could only defeat counterdefendants' motion if it raised genuine issues concerning the existence of a boycott or refusal to deal. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356.[21]

Assuming for the moment that Karen-Leslie can establish (1) that there was an antitrust violation consisting of an illegal boycott or concerted refusal to deal and (2) that this conduct injured it in its business or property by causing it to lose sales due to its inability to obtain Lladro during the years 1978–81 and (3) that this injury was causally related to counterdefendants' violations, Karen-Leslie's injury can be deemed an antitrust injury within the meaning of *Brunswick*, at least at this

---

en–Leslie did not argue that it was injured during this latter period and the Court sees nothing in the record to so indicate. *Cf. Original Appalachian Artworks Inc. v. Granada Electroncs*, 229 U.S.P.Q. (BNA) 54, 58 (S.D.N.Y. Feb. 20, 1986) [Available on WESTLAW, 1986 WL 2402] (citation omitted) (finding that gray goods importers benefit from any anticompetitive conduct of trademark holder because inflated price of domestic products makes it economically feasible for gray marketer to purchase products in Europe and import them into U.S.), *aff'd*, 816 F.2d 68 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). Accordingly, this opinion will be confined to the injury alleged to have been suffered from 1978–1981.

**21.** The circumstantial evidence of a price-fixing conspiracy is not necessary to establish the existence of a concerted refusal to deal in this case because there is direct evidence of an agreement between Weil and the dealers that the dealers would not sell to anyone but consumers.

Karen–Leslie's argument that "[a] finding that non-price restrictions are part of a price-fixing conspiracy suffices to subject the entire conspiracy to *per se* treatment," Counterplaintiff's Memorandum at 26 & 30 (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 760 n. 6, 104 S.Ct. 1464, 1468–69 n. 6, 79 L.Ed.2d 775 (1984)), is not relevant to the injury inquiry before this Court. As the Court explained in *Matsushita*, "[h]owever one decides to describe the contours of [an] asserted conspiracy," an antitrust plaintiff "must show that the conspiracy caused [it] an injury for which the antitrust laws provide relief." 475 U.S. at 584 n. 7, 106 S.Ct. at 1354–55 n. 7 (citations omitted). Be-cause most of the allegedly illegal behavior— whether described as one overall conspiracy or as several—set forth in *Matsushita* involved behavior that although violative of the antitrust laws would not have harmed the plaintiffs, the Court concluded that the required showing depended on proof that the defendants had conspired to price predatorily in the American market. *Id.* at 586, 106 S.Ct. at 1356. Only this conduct, as opposed to the other kinds of illegal conduct alleged by the plaintiffs, would have injured the plaintiffs. *Id.*

In *Matsushita*, the plaintiffs alleged that the defendants had engaged, *inter alia*, in a conspiracy to fix prices, a conspiracy to impose non-price restraints that allegedly effected market prices or limited output, and a conspiracy to monopolize by predatorily pricing. *Id.* at 582–83, 106 S.Ct. at 1354. The plaintiffs argued that the first two conspiracies, which were found not to have caused them injury, should be viewed as circumstantial evidence of the third conspiracy, which had caused injury. *Id.* at 584, 106 S.Ct. at 1354–55. The Court determined that evidence of the first two conspiracies would defeat the defendants' motion for summary judgment only if it raised a genuine issue of fact with respect to the existence of the only conspiracy that could have injured the plaintiffs. 475 U.S. at 586, 106 S.Ct. at 1356.

As in *Matsushita*, the price-fixing conspiracy alleged here could not have harmed Karen-Leslie; thus, Karen-Leslie has no cognizable price-fixing claim and its attempt to rely on the *Monsanto per se* standard to circumvent the injury requirement of *Brunswick* and other relevant cases must fail. *Cf. Matsushita*, 475 U.S. at 584–85 n. 8, 106 S.Ct. at 1355 n. 8.

stage of the proceedings.[22] As one court has noted, "an injury suffered by one competitor by virtue of a conspiracy engaged in by another competitor is, if not prototypical, certainly the kind of injury about which the antitrust laws are concerned." *International Television Productions Ltd. v. Twentieth Century-Fox Film Corp.*, 622 F.Supp. 1532, 1538 (S.D.N.Y.1985) (footnote omitted) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982)).[23]

However, Karen-Leslie's counterclaim and its supporting papers suffer from a defect that may prove fatal to its ultimate ability to prove antitrust injury. The Supreme Court in *Brunswick* determined that to recover treble damages, an antitrust plaintiff must prove antitrust injury, which is an "injury reflect[ing] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" and is "of the type the antitrust laws were intended to prevent." 429 U.S. at 489, 97 S.Ct. at 697. In reaching this conclusion, the Court set forth an oft-quoted maxim in antitrust law: "The antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*.'" *Id.* at 488, 97 S.Ct. at 697 (emphasis in original) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

On the record before it, the Court is unable to determine whether Karen-Leslie's showing of injury will ultimately satisfy the *Brunswick* test. However, at this stage of the proceedings, a failure to make a dispositive showing is not fatal [24] because counterdefendants have failed to sustain their burden of establishing that there are no genuine issues of fact with respect to injury to competition.

### (2) *Standing*

While the antitrust injury analysis focuses on the harm to competition and on those who have suffered from that harm, the antitrust standing analysis focuses on who the proper plaintiff is from among those classes of plaintiffs who have suffered antitrust injury. *See, e.g., Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); Page, "The Scope of Liability for Antitrust Violations," 37 *Stan.L.R.* 1445, 1484 (1985). In *Associated General Contractors*, the Supreme Court set forth a number of factors to be considered in determining whether a plaintiff has standing. These factors are: (1) whether there is a causal connection between the antitrust violation and the plaintiff's harm; (2) whether the defendants intended to cause that harm; (3) whether the injury is of the type intended to be prevented within the meaning of *Brunswick*; (4) whether the injury is direct or indirect; (5) whether the claim of damages is too speculative; (6) whether there is a risk of duplicative recoveries and a danger of complex apportionment. *Id.* 459 U.S. at 537–45, 103 S.Ct. at 908–12.

Applying these factors to the present case, it is clear that Karen-Leslie has standing to assert its claims. First, there is a causal connection between the alleged concerted refusal to deal and Karen-Leslie's injury—the alleged exclusion from the market. Second, while the parties contest the issue of intent or motive, this factor is not dispositive. *See Associated General Contractors*, 459 U.S. at 537 n. 37, 103 S.Ct. at 908 n. 37; *McCready*, 457 U.S. at 479, 102 S.Ct. at 2548. Third, even though Karen-Leslie may ultimately fail to satisfy the *Brunswick* test for antitrust

---

**22.** The Court will not address at this time Karen–Leslie's ultimate ability to show damages. *See, e.g., Beach v. Viking Sewing Machine Co.*, 784 F.2d 746, 752 (6th Cir.1986) (finding plaintiff's proof of damages stemming from inability to acquire desired dealership insufficient where plaintiff failed to demonstrate that defendant's product was unique and that comparable alternative brands were unavailable).

**23.** The parties agree that Karen–Leslie and Weil are competitors at the wholesale level.

**24.** One court has opined, for instance, that a decision with respect to antitrust injury cannot be made in most cases until after trial. *See Haff v. Jewelmont Corp.*, 594 F.Supp. 1468, 1472 n. 2 (N.D.Cal.1984). While this Court does not find the reasoning of the *Haff* court fully persuasive, it nevertheless finds that a resolution of the issue at this time is not essential for the reason set forth in the text following this footnote.

injury, as discussed previously, its showing thus far is sufficient to withstand counterdefendants' motion. Next, as an immediate victim—indeed, the alleged target—of the concerted refusal to deal, Karen-Leslie's injury is a direct one; there is thus no other "identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" and who would be less remote than Karen-Leslie. *See Associated General Contractors,* 459 U.S. at 541–42, 103 S.Ct. at 910–11. The only other "persons" who could arguably assert an antitrust claim based on injury resulting from the asserted refusal to deal are those retailers that have allegedly been precluded from continuing to deal with Karen-Leslie and have thus lost sales. The fact that these retailers could also bring a claim, however, does not bar Karen-Leslie's claim. *See id.* at 540–41, 103 S.Ct. at 909–10; *McCready,* 459 U.S. at 473–75 & 478–79, 102 S.Ct. at 2545–46 & 2548; *Crimpers Promotions Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 293–94 (2d Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). With respect to the issue of damages, Karen-Leslie's claim is not highly speculative. Because it was a participant in this market for many years before the alleged illegal exclusion, its claim of lost sales and expected profits should be readily calculable. *See, e.g., Crimpers,* 724 F.2d at 297.[25] Finally, there is no risk of duplicative recovery or complex apportionment of damages as discussed in cases involving passed-on overcharges and indirect purchasers. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The injury asserted by Karen-Leslie is distinct from any injury that could be asserted by the retailers and involves a different theory of recovery.

Thus, it does not fall within the bar to standing set forth in *Illinois Brick.*

Accordingly, counterdefendants' arguments notwithstanding, Karen-Leslie has standing under section 4 of the Clayton Act to sue for its injuries caused by counterdefendants' alleged illegal refusal to deal.

**(b) Section 16 of the Clayton Act**

Section 16 of the Clayton Act provides in relevant part that:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by court of equity....

15 U.S.C. § 26.

Karen-Leslie seeks to enjoin counterdefendants from "further violations" of sections 1 and 2 of the Sherman Act. As a preliminary matter, the Court notes that at this point in the proceedings, little remains to be considered with respect to Karen-Leslie's section 16 claim for relief. As discussed *infra,* the Court is unable to address the sufficiency of any of Karen-Leslie's section 2 claims because there has been no adequate definition of the relevant market. Thus, the Court will not address counterdefendants' standing arguments in so far as they relate to the section 2 claims.

With respect to the section 1 claims, the Court has already determined that Karen-Leslie has no cognizable price-fixing claim under section 4 of the Clayton Act because it has suffered no injury resulting from the alleged price-fixing scheme. The same conclusion bars an action for injunctive relief under section 16. In *Zenith Radio Corp. v. Hazeltine Re-*

---

**25.** The inquiry as to whether a damages claim is highly speculative is distinct from the issue of whether a plaintiff can prove its damages. Reliance on a highly speculative theory would probably bar standing. *See, e.g., McCready,* 457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11 (noting cautious approach when damages theory is "speculative, abstract, or impractical"). In contract, reliance on a theory that is not speculative but is somewhat difficult to prove does not bar standing so long as injury to business or property is shown. *See, e.g., Jayco Systems, Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 314 n. 21 (5th Cir.1985) (citations omitted), *cert. denied,* — U.S. —, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986). Thus, Karen–Leslie's ability to prove its damages, *see* note 24 *supra,* is not of concern under this analysis, except to show that its claim is not highly speculative.

*search, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (citations omitted), the Court explained that section 16 of the Clayton Act authorizes injunctive relief if a plaintiff "demonstrate[s] a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Karen-Leslie has failed to allege, much less demonstrate, any significant threat of injury resulting from counterdefendants' alleged price-fixing scheme. Thus, while Karen-Leslie is correct in its statement that the antitrust standing requirements under section 16 are less stringent than those under section 4, *see* Counterplaintiff's Memorandum at 32 n. 10; *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 753 F.2d 1354, 1358 (6th Cir.1985), *cert. dism'd,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985); *Grumman Corp. v. LTV Corp., CKH,* 665 F.2d 10, 16 n. 4 (2d Cir.1981); *cf. Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 490 n. 7, 93 L.Ed.2d 427 (1986), it is nevertheless necessary to show *some* injury or threat of injury, *see, e.g., Ashley Meadows Farm, Inc. v. American Horse Shows Ass'n,* 624 F.Supp. 856, 858 (S.D.N.Y.1985) ("individual injury, whether past or future, remains the crux of a private action").[26]

■ What survives of Karen-Leslie's section 1 claim is that counterdefendants engaged in an illegal boycott or concerted refusal to deal. Although, as discussed *supra,* Karen-Leslie can demonstrate the requisite *actual* injury for purposes of section 4 of the Clayton Act for only the years 1978–81, its action pursuant to section 16 is not necessarily limited to this time period because section 16 requires only a showing of significant *threat* of injury and thus allows for prospective relief. However, Karen-Leslie has not established that it has suffered any injury since 1981 when it found an alternative source of supply and has not demonstrated that it currently faces or will in the future face any signifi-

cant risk. Thus, counterdefendants' motion with respect to that part of the claim relating to violations of section 1 of the Sherman Act is granted. *Cf. Ashley Meadows,* 624 F.Supp. at 858 ("where a plaintiff is unable 'to cite to any contemporaneous damages from which a reasonable inference of future damages could be drawn,' the 'significant threat' of injury that would entitle it to injunctive relief has not been shown") (citations omitted). Specifically, counterdefendants' motion for summary judgment with respect to Karen-Leslie's standing under section 16 of the Clayton Act to assert a claim based on counterdefendants' alleged illegal refusal to deal or alleged price-fixing scheme is granted.

### 2. Substantive Claims

As discussed previously, Karen-Leslie has no standing to contest the alleged conspiracy to fix prices and evidence of that conspiracy can be used only to defeat counterdefendants' motion if, in context, it raises a genuine issue concerning the existence of some other conspiracy that has injured Karen-Leslie. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. In this case, the other conspiracy alleged is an illegal boycott or refusal to deal.

### (a) Conspiracy

■ Essential to any section 1 claim is the existence of an agreement between two or more independent entities. *See* 15 U.S.C. § 1 (prohibiting any *"contract, combination . . ., or conspiracy,* in restraint of trade")* (emphasis added); *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) ("Independent action is not proscribed" under section 1); *accord International Distribution Centers,* 812 F.2d at 793. Karen-Leslie asserts in its counterclaim that counterdefendants conspired among themselves[27] and with their autho-

---

**26.** Karen–Leslie has failed to address adequately any issues relevant to the standing analysis required by section 16 of the Clayton Act. Instead, it relies primarily on the argument that because it has standing under section 4 and because the standing requirements under section 16 are less stringent than those under sec-

tion 4, it therefore has standing under section 16. This argument is inadequate as noted in the text.

**27.** Counterdefendants' argument that because Lladro, S.A., DAISA, and Weil are related entities, they are incapable as a matter of law of

rized retailers to boycott Karen-Leslie. This conduct, if true, would constitute a vertical conspiracy involving different levels of actors on the distribution chain.[28]

■ The parties apparently agree that the conspiracy, if any, between counterdefendants and the authorized retailers is embodied in a "letter agreement" between Weil and its authorized retail accounts, *see* Counterdefendants' Memorandum, Exhibit G, which places location and customer restrictions upon the retail dealers. The relevant portion of this agreement specifies that all Lladro merchandise shipped by Weil to a retailer must be sold "only at retail" and "not [be] sold to anyone else." [29] Karen–Leslie argues that this agreement is

evidence of an illegal price-fixing scheme and that this scheme includes a concerted refusal to deal or boycott. Counterdefendants argue that the agreement must be deemed a reasonable customer restriction within the meaning of *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).[30] Although Karen-Leslie has not explicitly referred to the letter agreement as evidence of an agreement to boycott it, this conclusion is implicit in its argument and has apparently been so viewed by counterdefendants. For purposes of this motion, the Court also will consider the letter agreement to be the basis of Karen-Leslie's claim that counterdefendants "agreed" with the retailers to boycott Karen-Leslie.

---

conspiring with each other within the meaning of section 1 of the Sherman Act is, of course, true. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Karen–Leslie has not contested counterdefendants' argument that counterdefendants could not, as a matter of law, have conspired with Weil's sales representatives. *See* Counterplaintiff's Memorandum at 6 n. 3. Because a discussion of this issue is not necessary for a resolution of this motion, the Court will not address this argument.

**28.** Karen–Leslie's allegations with respect to the existence of a horizontal conspiracy relate only to the alleged price-fixing scheme and thus will not be addressed. *See* note 21 *supra.*

**29.** The letter agreement reads as follows:
Dear Customer:
We are sure you share our pride in the excellence of our LLADRO line.
To maintain that excellence, it is essential that we know who our customers are and what they do with our merchandise from the time we ship it to the time of its retail sale. For that reason, we ask that you acknowledge, by signing and returning the duplicate copy, your agreement that all LLADRO merchandise we ship to you must be sold by you only at retail and only at a location to which we ship it, or to which we otherwise specifically agree and not sold to anyone else or transferred to any other location for resale.
We appreciate your cooperation.
Very truly yours,
WEIL CERAMICS & GLASS, INC.
Counterdefendants' Memorandum, Exhibit G.

**30.** Counterdefendants strenuously argue that the customer restriction clause is reasonable and should be upheld by this Court. They assert that the sole purpose for it is to ensure that Lladro, a high-quality item, will be sold from

locations meeting the standards of Weil. *See, e.g.*, Counterdefendants' Reply at 14. Specifically, counterdefendants assert that

> the primary reason for Weil's restrictions is that Weil wants only retail stores having an image compatible with Lladro brand giftware to sell the Lladro brand products supplied by Weil. Weil is very concerned with the reputation of its Lladro trademark, and sells its products only to those retail stores which it believes will support and add to the reputation, rather than detract from it.

· · · · ·

> [T]he customer limitation ... is intended to prevent a retail store, which meets Weil's standards, from selling the products purchased from Weil at wholesale to another retailer or a middleman for eventual sale from a location which may detract from the Lladro image. If the image and reputation of the Lladro name is tarnished, then Lladro brand products will not be able to compete as well with the dozens of others [Sic] products competing with the Lladro brand. The purpose of the ... customer restriction is, therefore, to maintain the reputation of the Lladro line of giftware, so that its competitive position vis-a-vis other brands may be maintained.

*Id.* at 14–15.
Customer restrictions such as this must be evaluated under the rule of reason, *see Sylvania*, 433 U.S. at 57–59, 97 S.Ct. at 2561–62; *see also id.* at 46, 97 S.Ct. at 2555, and for the reasons discussed previously, the Court is unable to make such a determination on the record before it. *See, e.g., W.H. Brady Co. v. Lem Products, Inc.*, 659 F.Supp. 1355, 1379 (N.D.Ill.1987) ("As in all rule of reason analyses, in order to establish that a customer assignment is unreasonable, a plaintiff must first prove that the supplier had significant market power....") (citing *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1435 (7th Cir.1986)).

Putting aside, for the moment, the dispute over the meaning of the terms in the agreement and the dispute over whether the restrictions in the agreement unreasonably restrain trade, it is clear that this document represents an express agreement between Weil and its retail customers and thus satisfies the section 1 agreement requirement.

#### (b) Group Boycott Claim

The Supreme Court has long recognized certain restraints to be *per se* violations of section 1. These restraints, "because of their pernicious effect on competition and lack of any redeeming virtue[,] are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The "prevailing standard of analysis," however, is the "rule of reason" under which "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Sylvania*, 433 U.S. at 49, 97 S.Ct. at 2557.

Certain "group boycotts" or concerted refusals to deal have been deemed to fall within the class of restraints meriting *per se* treatment under section 1. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The types of concerted refusals to deal that are deemed to be *per se* violations have been limited by the courts in various ways. The Second Circuit, for instance, has determined that vertical restraints do not fall within the traditional category of group boycott cases characterized as *per se* violations of section 1. *See Oreck Corp. v.*

*Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).[31] Other circuits have agreed with this conclusion. *See, e.g., Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582 (8th Cir.1987).

In *Northwest Wholesale Stationers, supra*, the Supreme Court further limited the kinds of refusals to deal that are deemed to be *per se* illegal. The Court held that absent a threshold showing that a defendant "possesses market power or exclusive access to an element essential to competition," a restraint should be judged under the rule of reason. 472 U.S. at 296, 105 S.Ct. at 2620–21; *accord F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) ("the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor").

 As discussed *infra*, Karen-Leslie has failed to make the threshold showing required by the Supreme Court. Even if it had, however, the vertical arrangement at issue would not fall within the traditional "group boycott" category as defined by the Second Circuit in *Oreck*. Finally, the Court is unable to conclude, as required by the Supreme Court, that the customer restriction at issue "appears to be [a practice] that would always or almost always tend to restrict competition and decrease output." *Northwest Wholesale*, 472 U.S. at 289–90, 105 S.Ct. at 2617.

Thus, this vertical arrangement cannot be characterized as a *per se* violation and must instead be evaluated under the rule of

**31.** In reaching this conclusion, the Second Circuit explained:

> Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buy-

> ers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products, see *Continental T.V., Inc. v. GTE Sylvania, Inc., supra*, 433 U.S. at 54, 97 S.Ct. 2549. They are, therefore, to be examined under the *rule of reason* standard. See Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum. L.Rev. 979 at 985–87 (1977).

*Oreck*, 579 F.2d at 131.

reason. *See Sylvania*, 433 U.S. at 59, 97 S.Ct. at 2562 (vertical nonprice restrictions are to be judged under rule of reason).[32]

### (c) Rule of Reason

■ To determine whether an agreement is an unreasonable restraint on trade under the rule of reason, the factfinder must weigh all the circumstances of the case, *Sylvania*, 433 U.S. at 49, 97 S.Ct. at 2557, and must analyze whether the agreement is anticompetitive in purpose or effect, *Oreck*, 579 F.2d at 133.

■ Because the rule of reason analysis "[f]ocuses directly on the challenged restraint's impact on competitive conditions," *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978), Karen-Leslie must prove more than an injury to itself, *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697. It must prove that competition in the relevant market was harmed. *Hayden Publishing*, 730 F.2d at 69–70 ("Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case.") (citations omitted).

■ The threshold issue in any rule of reason analysis, therefore, is the appropriate definition of the relevant market. *See Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*, 641 F.Supp. 1179, 1189 (S.D.N.Y.1986); *see also Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.*, 794 F.2d

1359, 1363 (9th Cir.1986).[33] As discussed *supra*, the parties dispute the appropriate definition. Based upon the record, the Court concludes that there is a genuine issue of material fact with respect to the contours of the relevant market, which precludes summary judgment on the issue of whether the customer restriction is a reasonable restraint on trade.[34]

## C. SECTION 2 CLAIMS

Karen-Leslie asserts that "Lladro, DAISA, and Weil Ceramics have combined, conspired, contracted, and agreed among themselves, with their authorized retailers in the United States, and with other parties and persons ... to restrain trade and to monopolize and attempt to monopolize the sale and distribution in the United States of various Lladro porcelain figurines ... in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2." Counterclaim ¶ 15. Karen-Leslie further alleges that counterdefendants have committed certain acts with the specific intent of furthering their illegal purpose—that is, "to restrain trade in and create and maintain an unlawful monopoly for the counterdefendants in the sale and distribution in the United States of porcelain figurines, Lladro porcelain figurines and/or the various allegedly copyrighted Lladro porcelain figurines." *Id.* ¶ 16. Karen-Leslie further alleges that "the aforesaid acts have been committed with the specific intent to monopolize or attempt to monopolize the sale and distribution of Lladro porcelain figurines, and there is a dangerous probability that coun-

---

**32.** *See* note 23 *supra*.

**33.** The Supreme Court has determined that " 'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' " *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986) (quoting 7 P. Areeda, *Antitrust Law* § 1511, at 429 (1986)). There is no showing in this case of "actual, sustained adverse effects on competition," *id.*; thus, this alternative to an elaborate market analysis is not available.

**34.** The Court notes that in addition to the question of the impact on competition in the rele-

vant market, there is also a question as to whether alternative sources of supply were available or whether Karen–Leslie was in fact excluded from competition in the relevant market as a whole. *See, e.g., Oreck*, 579 F.2d at 128–29; *Schwartz v. Jamesway Corp.*, 660 F.Supp. 138, 141 (E.D.N.Y.1987). The availability to Karen–Leslie of alternative brands that compete in the same market as Lladro porcelain and that are reasonably interchangeable would certainly weaken, if not destroy, Karen–Leslie's argument that it was excluded from the relevant market. *See, e.g., Oreck*, 579 F.2d at 128–29. Because the parties have not even satisfied the Court with respect to the required threshold showing of the impact on the relevant market, the Court need not address the issue of alternative sources.

terdefendants will succeed in monopolizing said sale and distribution." *Id.* ¶ 18.

Although Karen-Leslie's counterclaim is rather inartfully worded, Karen-Leslie appears to be asserting three separate violations of section 2 of the Sherman Act [35]—conspiracy to monopolize, attempt to monopolize, and monopolization. For the reasons set forth below, counterdefendants' motion for summary judgment with respect to the section 2 claims is denied.

### 1. Conspiracy to Monopolize

The elements of this cause of action are "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *International Distribution Centers*, 812 F.2d at 795 (quoting *Paralegal Institute, Inc. v. American Bar Ass'n*, 475 F.Supp. 1123, 1132 (E.D.N.Y. 1979), *aff'd mem.*, 622 F.2d 575 (2d Cir. 1980)) (footnote omitted). The Second Circuit recognizes this cause of action as distinct from a cause of action for attempt to monopolize and has noted that a major difference between the two is that there is no need to show a dangerous probability of success as an element of a conspiracy to monopolize. *See id.* at n. 8; *see also* discussion of attempt to monopolize *infra*.

The parties have not addressed this cause of action in the papers currently before the Court. The Court therefore declines to rule on whether counterdefendants are entitled to judgment as a matter of law.

### 2. Attempt to Monopolize and Unlawful Monopolization

The essential elements of a cause of action for attempted monopolization are: "(1)

anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a 'dangerous probability' that the attempt will succeed." *International Distribution Centers*, 812 F.2d at 790 (citations omitted). The elements of the substantive offense of monopolization are: "(1) the possession of monopoly power in the relevant market and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

To establish a claim of monopolization or attempted monopolization, it is necessary "to appraise the exclusionary power of the [asserted illegal conduct] in terms of the relevant market for the product involved." *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *accord International Distribution Centers*, 812 F.2d at 791. A market definition is required as a "way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process*, 382 U.S. at 177, 86 S.Ct. at 350. Thus, without an appropriate definition of the relevant market, it is impossible to evaluate the merits of these claims. *See, e.g., International Distribution Centers*, 812 F.2d at 792 (market share analysis is essential although "not necessarily determinative").[36]

While the parties have agreed that the relevant geographic market is the United States, they vigorously contest the definition of the relevant product market. *See* discussion *supra*. Because a determination of the relevant market is a threshold requirement in determining the merits of either claim under section 2 and because the Court has determined that there is a

---

**35.** Section 2 of the Sherman Act provides in relevant part that

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty....

15 U.S.C. § 2.

**36.** Because this threshhold issue has not been resolved, the Court will not address the other

factors that must be considered in determining whether counterdefendants have monopoly power or a dangerous probability of acquiring monopoly power. *See International Distribution Centers*, 812 F.2d at 792 (other market characteristics that must be considered in addition to market share are strength of competition, probable development of the industry, barriers to entry, nature of asserted anticompetitive conduct, and elasticity of consumer demand) (citations omitted).

genuine question of material fact with respect to the definition of the relevant product market, counterdefendants' motion for summary judgment must be denied on both section 2 claims.

### 3. Copyright and Trademark Misuse

Karen-Leslie asserts in its counterclaim that counterdefendants engaged in certain specified anticompetitive activities.[37] Specifically, Karen-Leslie asserts that counterdefendants falsely marked with copyright notice Lladro figurines that were uncopyrightable; misused any valid copyrights by bringing and threatening to bring copyright infringement actions and "by using these copyrights and overwhelming economic powers to force the defendants of such actions to agree not to import any Lladro figurines, including those that are uncopyrightable, and/or not to resell any Lladro porcelain figurines, including those that have been the subject of a valid first sale"; and attempted to use the Lladro trademark registration to block the importation into the U.S. by anyone other than Weil of original Lladro goods. Counterclaim ¶ 15. Karen–Leslie claims that it has been injured because of lost sales and profits and because it was forced to make expenditures for legal defenses. Amended Counterclaim ¶ 19.

The Court has determined that there are genuine issues of fact precluding summary judgment on the section 2 claims and, indeed, precluding any consideration whatsoever of the merits of these claims. Thus, the Court could decline to address the allegations respecting copyright and trademark misuse pending a showing with respect to the existence of the threshhold requirements necessary to maintain the section 2 claims. However, because some of these allegations are patently unsupportable, the Court will address them now.

### (a) False Marking of Copyright Notice

Counterdefendants argue that Karen-Leslie has no standing to complain about the alleged false marking of Lladro porce-

lain. Counterdefendants note that Karen-Leslie's president admitted that he did not rely on the presence or absence of copyright notice on the figurines; indeed, he indicated that he did not know what a copyright is or what the legal effect of it is. While this argument might have merit, *but cf. Clark Equipment Co. v. Lift Parts Mfg.,* Copyright L.Dec. (CCH) ¶ 25,989 (N.D.Ill. Apr. 7, 1986) [Available on WEST-LAW, 1986 WL 4423], the Court finds that a dismissal of this allegation is warranted on another ground.

■ There is no evidence before the Court that DAISA or the other counterdefendants falsely marked the figurines with "the wilful and fraudulent intent to create the false impression that each and every Lladro porcelain figurine sold in the United States is subject to a U.S. copyright." Counterclaim ¶ 15(a). While the Court has concluded that DAISA's copyrights are invalid for failure to correct the omission of notice, there is no indication that counterdefendants knew or believed that the copyrights would ultimately be found to be invalid. Indeed, there is evidence that DAISA believed that it had complied with the statutory requirements and that it had, in fact, complied with at least part of the cure provision.

The only support Karen–Leslie has submitted for its allegation of fraudulent intent is a document from a DAISA executive to the DAISA factory indicating the need to add copyright notice to the figurines. *See* Counterplaintiff's Memorandum at 38; Counterdefendants' Reply, Exhibit S. The Court sees no basis for concluding that this document shows anything but an effort, albeit an insufficient one, to comply with the copyright statute. It certainly provides no support for any inference of fraudulent intent.

Accordingly, the Court will grant counterdefendants' motion with respect to this issue.

### (b) Misuse of Valid Copyrights

Karen–Leslie's allegation that counterdefendants misused any valid copyrights by

---

**37.** While Karen–Leslie has not indicated that the specified activities discussed in the text fall within the prohibition of section 2 of the Sherman Act, the Court presumes that Karen-Leslie meant to so indicate as there is no allegation of "agreement," which would be a necessary prerequisite for a section 1 claim.

bringing and threatening to bring infringement actions is without merit. First, as noted by one court, "lawsuits have only rarely been treated as part of an antitrust conspiracy." *W. Goebel Porzellanfabrik v. Action Industries, Inc.*, 589 F.Supp. 763, 767 (S.D.N.Y.1984). Second, as the court in *Goebel* and other courts have determined, "[w]here the holder of a valid copyright brings suit in good faith and based on reasonable grounds, '[w]hatever other anticompetitive activity the [copyright holder] may be guilty of, the [copyright laws] would seem to authorize him to bring such a non-frivolous suit.'" *Id.* (quoting *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 882 (2d Cir.1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972)); *accord Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68, 74 (2d Cir.) (trademark infringement), *cert. denied*, —— U.S. ——, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). While DAISA's copyright has now been declared invalid, this finding does not change the law with respect to a good faith effort to enforce what was believed to be a valid copyright. *See, e.g., Toro Co. v. R & R Products Co.*, 600 F.Supp. 400, 401 (D.Minn.1984) ("the good faith attempt to protect a copyright interest, even if unsuccessful, is a defense to an action....") (citation omitted), *aff'd*, 787 F.2d 1208 (8th Cir.1986); *accord Classic Film Museum, Inc. v. Warner Bros., Inc.*, 523 F.Supp. 1230, 1234 (D.Maine 1981). Karen–Leslie alleges, at least implicitly and without any support, that counterdefendants' infringement suit was not brought merely to enforce their rights, but was brought in bad faith or to harrass Karen–Leslie and others. Such an allegation, if true, would strip counterdefendants of their immunity from suit under the "sham" exception to the *Noerr–Pennington* doctrine.

■ "Under the *Noerr–Pennington* doctrine, attempts to gain favorable action from the legislature, executive branch, agencies or courts are shielded from Sher-

man Act liability, even if motivated by anticompetitive intent...." The *T.N. Dickinson Co. v. L L Corp.*, 227 U.S.P.Q. 145, 148 (D.Conn.1985). *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mineworkers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *see generally Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785, 806–09 (2d Cir.1983) (discussing doctrine), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). The "sham" exception to the *Noerr–Pennington* doctrine strips away this immunity if an action is brought without probable cause or in bad faith. *See California Motor Transport*, 404 U.S. at 513, 92 S.Ct. at 613; *Goebel*, 589 F.Supp. at 767 (citation omitted); *see generally Litton*, 700 F.2d at 809–12 (discussing "sham" exception).

■ Karen–Leslie has not shown that the copyright infringement suit was brought in bad faith or without probable cause or to harass and thus cannot invoke the sham exception. Absent such a showing, or a showing that there is at least a fact question regarding this issue, counterdefendants' infringement suit, brought to protect an interest they reasonably believed they had, is immune from suit under *Noerr–Pennington*.[38]

■ Finally, Karen–Leslie's assertion that counterdefendants used their copyrights and "overwhelming economic powers to force defendants [in infringement actions] to agree not to import any Lladro porcelain figurines" is totally without merit and unsupported by anything in the record. First, Karen–Leslie has no standing to challenge allegedly coercive lawsuits brought against other parties. Second, even if Karen–Leslie seeks to use this allegation as evidence of a larger anticompetitive

---

**38.** Karen–Leslie attempts to characterize this Court's previous ruling on counterdefendants' motion to dismiss as a rejection of counterdefendants' *Noerr–Pennington* arguments. Counterplaintiff's Memorandum at 39 n. 12. This assertion is without merit. At the April 6, 1984 oral hearing on counterdefendants' motion to dismiss, this Court merely held that taking the allegations of the complaint as true, Karen–Leslie's complaint was sufficient to withstand the motion. That ruling was not dispositive with respect to the merits of counterdefendants' claim of immunity.

scheme, rather than as evidence of an injury to itself, it has not sustained its burden on this motion because it has not supported even an inference that there is a triable issue of fact. Finally, if Karen–Leslie seeks to use this allegation to support a finding of antitrust injury suffered by it and these other unnamed defendants, the claim must nevertheless· fail because such injury would, as the court in *Goebel* noted, be "strictly self-inflicted." *Cf. Goebel,* 589 F.Supp. at 766 (in finding that defendant had not suffered antitrust injury, court noted that "[t]he decision to stop importing [plaintiff's product] was not made in response to a court order, but was instead a unilateral decision on the part of [the defendant]").

**(c) Misuse of Trademark**

Although not asserted in its counterclaim, Karen–Leslie has raised in its opposition papers the claim that counterdefendants misused the Lladro trademark for the purpose of stifling competition. Karen–Leslie asserts that the institution of this lawsuit is part of counterdefendants' misuse and is a sham.

Unlike the two previous allegations for which the record is clear and for which there are no unresolved issues of fact, this claim may raise a factual dispute. Thus, the Court will not reach a determination on it at this stage of the proceedings because it is not clear that Karen–Leslie will be able to sustain its ultimate burden with respect to the threshold requirements for a section 2 claim. As discussed *supra,* there is no adequate definition of the relevant market before the Court and therefore any determination regarding an attempt to monopolize or monopolization is not possible. *See, e.g., Car–Freshner Corp. v. Auto Aid Manufacturing Corp.,* 438 F.Supp. 82, 87 (N.D.N.Y.1977) ("[t]he test to be applied in determining whether a trademark is being unlawfully used to confer a monopoly in a certain product is the same as in any other case wherein an unlawful monopoly, or attempt to monopolize, is alleged under Section 2 of the Sherman Act, 15 U.S.C. § 2.... The first, and perhaps most important, task to be performed is to define the relevant product in issue.") (citations omitted); *see also Hu–Friedy Mfg. Co. v. Peerless Int'l, Inc.,* 1986-2 Trade Cas.

(CCH) ¶ 67,197, at 60,958 (N.D.Ill. Apr. 14, 1986) [Available on WESTLAW, 1986 WL 9462] ("The ordinary requirements of a section 2 claim apply to the alleged creation of a monopoly based on the use of a trademark.") (citation omitted). If Karen–Leslie meets its burden on these threshhold requirements, it may be able to show that counterdefendants misused the trademark and that this lawsuit falls within the *Noerr–Pennington* sham exception.

**(d) Blocking Importation**

The Court must agree with counterdefendants that it is unclear how Karen–Leslie's allegations show a violation of the antitrust laws. Presumably, Karen–Leslie is asserting that counterdefendants have in some way, perhaps through institution of this lawsuit, illegally attempted to block importation in furtherance of their monopolistic activities. Rather than second-guess Karen–Leslie, the Court will dismiss this allegation and grant Karen–Leslie twenty days to replead it.

## CONCLUSION

Defendants' motion for summary judgment is granted with respect to plaintiff DAISA's copyright causes of action. Defendants' motion for summary judgment is granted and plaintiff Weil's cross-motion is denied with respect to Weil's claim pursuant to section 33(b) of the Lanham Act. Defendants' motion for summary judgment and plaintiff Weil's cross-motion are both denied with respect to Weil's infringement claim pursuant to section 32(1)(a) of the Lanham Act. Defendants' motion for summary judgment is granted and plaintiff Weil's cross-motion is denied with respect to Weil's claim pursuant to section 42 of the Lanham Act. Defendants' motion for summary judgment and plaintiff Weil's cross-motion are both denied with respect to Weil's claim pursuant to section 526 of the Tariff Act.

With respect to counterdefendants' motion for summary judgment on counterplaintiff Karen–Leslie's antitrust counterclaim, the Court reaches the following conclusions: Under section 4 of the Clayton Act, Karen–Leslie has suffered no injury and thus cannot challenge the alleged price-fixing scheme but does have standing

to challenge the alleged refusal to deal embodied in the customer restriction promulgated and enforced by Weil; this vertical restraint will be evaluated under the rule of reason; the Court does not reach the issue under section 4 of Karen–Leslie's injury or standing to challenge the alleged violations of section 2 of the Sherman Act; under section 16 of the Clayton Act, Karen–Leslie has no cognizable injury and thus cannot challenge the alleged price fixing scheme; the Court does not reach the issue of whether Karen–Leslie has standing to challenge the alleged violations of section 2 of the Sherman Act; because there is an unresolved question with respect to the proper definition of the relevant market, the Court will not address the substance of Karen-Leslie's section 1 and section 2 claims; counterdefendants' motion with respect to Karen-Leslie's allegations regarding false marking of copyright notice and misuse of copyright is granted; their motion regarding the alleged attempt to block importation is granted but Karen–Leslie has 20 days to replead; the Court will not address Karen–Leslie's allegations with respect to trademark misuse.

Karen-Leslie's request for attorney's fees and sanctions is denied.

SO ORDERED.